**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.*, LAFE BALL,<br><br>*Plaintiff,*<br>v.<br><br>ALCON INC., ALCON LABORATORIES, INC., and ALCON VISION, LLC,<br><br>*Defendants.* | Case No. 2:23-cv-03414-NIQA |

**DEFENDANTS ALCON VISION, LLC AND ALCON LABORATORIES, INC.'S**
**<u>MOTION TO DISMISS</u>**

Defendants Alcon Vision, LLC and Alcon Laboratories, Inc. (together, "Defendants"), by and through their undersigned attorneys, hereby move this Court pursuant to Federal Rule of Civil Procedure 12(b)(6) to dismiss the Amended Complaint with prejudice. In support of this Motion, Defendants submit the accompanying Memorandum of Law, which is incorporated herein by reference.

WHEREFORE, Defendants respectfully request that this Court dismiss the Amended Complaint with prejudice.

Dated: October 14, 2026

Respectfully submitted,


*/s/ Amy B. Carver*
Catherine M. Recker (PA ID No. 56813)
Amy B. Carver (PA ID No. 84819)
**WELSH & RECKER, P.C.**
306 Walnut Street
Philadelphia, PA 19106
Tel: (215) 972-6430
Fax: (985) 617-1021
cmrecker@welshrecker.com
abcarver@welshrecker.com

Ilene Albala (admitted *pro hac vice*)
J. Kirk Ogrosky (admitted *pro hac vice*)
Jordan L. Moran (admitted *pro hac vice*)
Jenna Welsh (admitted *pro hac vice*)
**GOODWIN PROCTER LLP**
1900 N Street, NW
Washington, DC 20036
Tel: +1 202 346 4000

*Counsel for Defendants Alcon Inc.; Alcon Laboratories, Inc.; and Alcon Vision, LLC.*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.*, LAFE BALL,<br><br>*Plaintiff,*<br>v.<br><br>ALCON INC., ALCON LABORATORIES, INC., and ALCON VISION, LLC,<br><br>*Defendants.* | Case No. 2:23-cv-03414-NIQA |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS ALCON VISION, LLC AND ALCON LABORATORIES, INC.'S MOTION TO DISMISS**

## TABLE OF CONTENTS

**Page**


TABLE OF AUTHORITIES .......... iii

INTRODUCTION .......... 1

BACKGROUND .......... 5

A. The Parties .......... 5

B. Cataract Surgeries and Medicare Reimbursement .......... 6

C. LASIK Surgeries and Medicare Reimbursement .......... 7

D. This Action .......... 7

E. Relator's Overlapping Texas Litigation & The Parties' Settlement .......... 10

LEGAL STANDARD .......... 11

ARGUMENT .......... 12

I. THE AMENDED COMPLAINT FAILS TO PLEAD AN FCA CLAIM PREDICATED ON ALLEGED AKS VIOLATIONS (COUNTS I–IV). .......... 13

A. Relator's FCA Claims Based on His AKS Theory Fail Because He Has Not Sufficiently Alleged AKS Scienter or Inducement. .......... 14

1. Relator has not alleged scienter. .......... 14

2. Relator has not pled the required element of AKS inducement with requisite particularity under Rule 9(b). .......... 18

B. The Amended Complaint does not sufficiently allege illegal remuneration .......... 22

1. The Amended Complaint supports that any "discounted" pricing was within fair market value and therefore not remuneration. .......... 22

2. The Amended Complaint supports that any "discounted" pricing was permissible under the AKS's discount protections. .......... 23

C. Relator Also Fails to Allege False Claims Submissions with Particularity, Providing Yet Another Basis for Dismissing the AKS Theory. .......... 25

D. Relator Has Not Pled the Elements of an FCA Claim. .......... 30

1. Relator fails to plead falsity because he has not alleged that providers submitted claims to Medicare for items resulting from AKS violations. . 30

2. Relator cannot allege materiality or loss because "Alcon's" service pricing did not impact Medicare reimbursements. ....................... 31

II. RELATOR HAS NOT PLAUSIBLY ALLEGED ANY SCHEME TO DEFRAUD THE DEPARTMENT OF VETERANS AFFAIRS (COUNTS I–IV). ............................ 33

III. RELATOR FAILS TO PLEAD A CONSPIRACY CLAIM (COUNT III). .................... 35

IV. RELATOR MAY NOT ASSERT A REVERSE FCA CLAIM (COUNT IV)................. 36

V. RELATOR'S RETALIATION CLAIM SHOULD BE DISMISSED (COUNT V). ....... 37

A. Count V Fails as to Alcon Laboratories Because It Did Not Play Any Part in Relator's PIP or Termination. ........................................................................... 37

B. Relator Fails to Plead the Elements of an FCA Retaliation Claim. ...................... 38

1. Relator has not alleged that he engaged in "protected conduct." ............. 38

2. Relator has not alleged that Alcon Vision placed him on a PIP and ended his employment because he engaged in protected conduct. ........... 40

C. Relator's Retaliation Claim Is Also Barred by a Prior Release. ........................... 41

VI. RELATOR LACKS AUTHORITY TO PROSECUTE COUNTS I-IV........................... 42

A. The FCA's *Qui Tam* Provisions Violate the Appointments Clause. .................... 43

B. The FCA's *Qui Tam* Provisions Violate the Vesting and Take Care Clauses...... 45

VII. THE COMPLAINT SHOULD BE DISMISSED WITH PREJUDICE. .......................... 46

CONCLUSION.............................................................................................................. 48

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**


*In re Aiken County*,
725 F.3d 255 (D.C. Cir. 2013) .....43, 45

*United States ex rel. Ascolese v. Shoemaker Constr. Co.*,
55 F.4th 188 (3d Cir. 2022) .....38

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .....12

*Ball v. Alcon Vision, LLC*,
No. 141-349539-24 (Tex. Dist. Ct. 2024) .....10, 11

*Banks v. Cnty. of Allegheny*,
568 F. Supp. 2d 579 (W.D. Pa. 2008) .....41

*United States ex rel. Bennett v. Bayer Corp.*,
2024 WL 1507689 (D.N.J. Apr. 4, 2024) .....47

*Buckley v. Valeo*,
424 U.S. 1 (1976) .....44

*Bulls v. FBI*,
2018 WL 5013787 (W.D. Pa. Oct. 15, 2018) .....47

*United States ex rel. Cairns v. D.S. Med. LLC*,
42 F.4th 828 (8th Cir. 2022) .....30

*United States ex rel. Cavallino Consulting, LLC v. Smith & Nephew, Inc.*,
2018 WL 3966301 (D. Mass. Aug. 17, 2018) .....35

*In re Celgene Corp., Inc. Sec. Litig.*,
747 F. Supp. 3d 748 (D.N.J. 2024) .....19

*CherCo Props., Inc. v. L. Snakard & Gambill, P.C.*,
985 S.W.2d 262 (Tex. App. 1999) .....42

*Chong v. 7-Eleven, Inc.*,
2019 WL 1003135 (E.D. Pa. Feb. 28, 2019) .....22

*United States ex rel. Collado v. Bracco USA, Inc.*,
2024 WL 1161384 (D.N.J. Mar. 14, 2024) .....47

*United States ex rel. Collado v. Bracco USA, Inc.*,
2025 WL 1261779 (3d Cir. May 1, 2025) ........................................................ 24, 25

*United States ex rel. Cooper v. Pottstown Hosp. Co., LLC*,
2015 WL 1137664 (E.D. Pa. Mar. 13, 2015) ........................................................ 22, 23

*Davis v. Abington Mem'l Hosp.*,
2012 WL 3206030 (E.D. Pa. Aug. 7, 2012) ........................................................ 21, 35

*United States ex rel. Davis v. Lockheed Martin Corp.*,
2010 WL 4607411 (N.D. Tex. Nov. 15, 2010) ........................................................ 42

*United States ex rel. Dietz v. Philips Respironics*,
2026 WL 975740 (W.D. Pa. Feb. 23, 2026) ........................................................ 15, 17

*DiFiore v. CSL Behring, LLC*,
879 F.3d 71 (3d Cir. 2018) ........................................................ 40

*United States ex rel. Dones v. Harlingen Med. Ctr.*,
701 F. Supp. 3d 636 (S.D. Tex. 2023) ........................................................ 19

*United States ex rel. Fitzer v. Allergan, Inc.*,
2022 WL 846211 (D. Md. Mar. 22, 2022) ........................................................ 28

*Flanagan v. Bahal*,
2015 WL 9450826 (D.N.J. Dec. 22, 2015) ........................................................ 33

*Foglia v. Renal Ventures Mgmt., LLC*,
754 F.3d 153 (3d Cir. 2014) ........................................................ 14, 25

*United States ex rel. Forney v. Medtronic, Inc.*,
2017 WL 2653568 (E.D. Pa. June 19, 2017) ........................................................ 22

*United States ex rel. Gharibian v. Valley Campus Pharmacy, Inc.*,
2021 WL 5406148 (C.D. Cal. Oct. 12, 2021) ........................................................ 18

*United States ex rel. Greenfield v. Medco Health Sols., Inc.*,
880 F.3d 89 (3d Cir. 2018) ........................................................ 13, 26, 30

*United States ex rel. Greenfield v. Medco Health Sys. Inc.*,
2014 WL 4798637 (D.N.J. Sept. 26, 2014) ........................................................ 35

*Hall v. Abington Mem'l Hosp.*,
2023 WL 6216526 (E.D. Pa. Sept. 25, 2023) ........................................................ 38, 39, 40

*United States ex rel. Hart v. McKesson Corp.*,
96 F.4th 145 (2d Cir. 2024) ........................................................ 16, 17

*United States ex rel. Headen v. Abundant Life Therapeutic Servs. Texas, LLC*,
2019 WL 1930274 (S.D. Tex. Apr. 30, 2019) ....................25, 26

*Hericks v. Lincare Inc.*,
2014 WL 1225660 (E.D. Pa. Mar. 25, 2014)....................29

*Hickman v. Spirit of Athens, Alabama, Inc.*,
985 F.3d 1284 (11th Cir. 2021) ....................39

*United States ex rel. Holbrook v. Brink's Co.*,
2015 WL 196424 (S.D. Ohio Jan. 15, 2015) ....................36

*United States ex rel. Hunter v. Fillmore Cap. Partners, LLC*,
2024 WL 1051971 (E.D. Pa. Mar. 11, 2024)....................11, 27, 34

*United States ex rel. Hutchins v. DynCorp Int'l, Inc.*,
342 F. Supp. 3d 32 (D.D.C. 2018)....................34

*Hutchins v. Wilentz, Goldman & Spitzer*,
253 F.3d 176 (3d Cir. 2001)....................33, 39, 40

*United States ex rel. Jensen v. Genesis Lab'y*,
2025 WL 615480 (D.N.J. Feb. 26, 2025) ....................18

*United States ex rel. Johnson v. Bethany Hospice & Palliative Care*,
2020 WL 1542339 (S.D. Ga. Mar. 31, 2020) ....................26

*United States ex rel. Judd v. Quest Diagnostics Inc.*,
638 F. App'x 162 (3d Cir. 2015) ....................26

*United States ex rel. Keeler v. Eisai, Inc.*,
2011 WL 13099033 (S.D. Fla. June 21, 2011) ....................42

*United States ex rel. Kelly v. Select Specialty Hosp.-Wilmington, Inc.*,
2018 WL 1568874 (D. Del. Mar. 30, 2018) ....................27

*United States ex rel. Klaczak v. Consol. Med. Transp.*,
458 F. Supp. 2d 622 (N.D. Ill. 2006)....................17

*United States ex rel. Kyer v. Thomas Health Sys., Inc.*,
178 F.4th 119 (4th Cir. 2026) ....................25

*United States ex rel. Lewis v. Cmty. Health Sys., Inc.*,
2020 WL 3103994 (S.D. Fla. June 11, 2020)....................23

*Lisenbery v. Olympus Corp. of the Ams.*,
2025 WL 609193 (E.D. Pa. Feb. 25, 2025) ....................39

*United States ex rel. Long v. Janssen Biotech, Inc.*,
2026 WL 2949353 (D. Mass. Sept. 30, 2026) ........................................................ 16

*United States ex rel. Lord v. NAPA Mgmt. Servs. Corp.*,
2017 WL 2653164 (M.D. Pa. June 20, 2017) ........................................................ 38

*Love v. Med. Coll. of Wisconsin*,
371 F. Supp. 3d 489 (E.D. Wis. 2016) ........................................................ 42

*Lucia v. SEC*,
585 U.S. 237 (2018) ........................................................ 43, 44

*United States ex rel. Martin v. Hathaway*,
63 F.4th 1043 (6th Cir. 2023) ........................................................ 30

*United States ex rel. Mbabazi v. Walgreen Co.*,
2021 WL 4453600 (E.D. Pa. Sept. 28, 2021) ........................................................ 31, 32, 37

*McGowan Inv'rs LP v. Keefe Bruyette & Woods, Inc.*,
540 F. Supp. 2d 571 (E.D. Pa. 2008) ........................................................ 42

*United States ex rel. Montcrief v. Peripheral Vascular Assocs., P.A.*,
133 F.4th 395 (5th Cir. 2025) ........................................................ 44, 46

*Morris v. W. Manheim Twp.*,
2013 WL 995551 (M.D. Pa. Mar. 13, 2013) ........................................................ 42

*Morrison v. Olson*,
487 U.S. 654 (1988) ........................................................ 44, 46

*United States ex rel. Omni Healthcare, Inc. v. Exagen, Inc.*,
2025 WL 959460 (D. Mass. Mar. 31, 2025) ........................................................ 16

*Padilla v. LaFrance*,
907 S.W.2d 454 (Tex. 1995) ........................................................ 41, 42

*United States ex rel. Penelow v. Janssen Prods., LP*,
No. 25-1818 (3d Cir.) ........................................................ 43

*Pension Ben. Guar. Corp. v. White Consol. Indus., Inc.*,
998 F.2d 1192 (3d Cir. 1993) ........................................................ 25

*United States ex rel. Perri v. Novartis Pharms. Corp.*,
2019 WL 6880006 (D.N.J. Feb. 21, 2019) ........................................................ *passim*

*United States ex rel. Petras v. Simparel, Inc.*,
857 F.3d 497 (3d Cir. 2017) ........................................................ 12, 36

*United States ex rel. Petratos v. Genentech, Inc.*,
141 F. Supp. 3d 311 (D.N.J. 2015) ........ 36

*United States ex rel. Petratos v. Genentech Inc.*,
855 F.3d 481 (3d Cir. 2017) ........ 14

*Phillips v. County of Allegheny*,
515 F.3d 224 (3d Cir. 2008) ........ 46, 47

*United States ex rel. Pilecki-Simko v. Chubb Inst.*,
443 F. App'x 754 (3d Cir. 2011) ........ 15

*United States ex rel. Polansky v. Executive Health Resources, Inc.*,
599 U.S. 419 (2023) ........ 46

*United States ex rel. Ruscher v. Omnicare, Inc.*,
663 F. App'x 368 (5th Cir. 2016) ........ 20

*United States ex rel. Sanders v. Am.-Amicable Life Ins. Co. of Tex.*,
545 F.3d 256 (3d Cir. 2008) ........ 32

*Schmidt v. Skolas*,
770 F.3d 241 (3d Cir. 2014) ........ 25

*United States ex rel. Schmidt v. Zimmer, Inc.*,
2005 WL 1806502 (E.D. Pa. July 29, 2005) ........ 27

*United States ex rel. Schroeder v. Hutchinson Reg'l Med. Ctr.*,
2024 WL 4298655 (D. Kan. Sept. 26, 2024) ........ 24

*Shanks v. Hall*,
2019 WL 2583013 (E.D. Pa. June 21, 2019) ........ 47

*United States ex rel. Silver v. Omnicare, Inc.*,
903 F.3d 78 (3d Cir. 2018) ........ 12, 22, 23

*United States ex rel. Sirls v. Kindred Healthcare, Inc.*,
469 F. Supp. 3d 431 (E.D. Pa. 2020) ........ 31, 32

*Sturgeon v. Pharmerica Corp.*,
438 F. Supp. 3d 246 (E.D. Pa. 2020) ........ 37

*United States ex rel. Suarez v. AbbVie Inc.*,
2019 WL 4749967 (N.D. Ill. Sept. 30, 2019) ........ 18, 28, 29

*United States ex rel. Switzer v. Wood*,
2024 WL 3742713 (S.D. Ga. Aug. 9, 2024) ........ 18

*United States ex rel. Thomas v. Lockheed Martin Aeroparts, Inc.*,
2016 WL 47882 (W.D. Pa. Jan. 4, 2016) .......... 34

*United States ex rel. Thomas v. Siemens*,
708 F. Supp. 2d 505 (E.D. Pa. 2010) .......... 36, 37

*The Confiscation Cases*,
74 U.S. 454 (1868) .......... 46

*Thompson v. Slatzer*,
2021 WL 3639682 (W.D. Pa. July 30, 2021) .......... 41

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021) .......... 45

*Trezza v. Soans Christian Acad., Inc.*,
2019 WL 1359740 (E.D. Pa. Mar. 25, 2019) .......... 38

*United States v. Donziger*,
38 F.4th 290 (2d Cir. 2022) .......... 44, 45

*United States v. Gilead Scis., Inc.*,
2025 WL 2627686 (E.D. Pa. Sept. 11, 2025) .......... 14, 15, 20, 22

*United States v. Goldman*,
607 F. App'x 171 (3d Cir. 2015) .......... 14

*United States v. Marlin Med. Sols. LLC*,
579 F. Supp. 3d 876 (W.D. Tex. 2022) .......... 36

*United States v. Novo Nordisk, Inc.*,
2024 WL 3582417 (W.D. Wash. July 30, 2024) .......... 20

*United States v. Regeneron Pharms., Inc.*,
128 F.4th 324 (1st Cir. 2025) .......... 30

*United States v. Shaw*,
106 F. Supp. 2d 103 (D. Mass. 2000) .......... 24

*United States v. Univ. of Pittsburgh of Commonwealth Sys. of Higher Educ.*,
2022 WL 14851121 (W.D. Pa. Oct. 26, 2022) .......... 40

*Universal Health Servs., Inc. v. United States*,
579 U.S. 176 (2016) .......... 11, 39

*Vt. Agency of Nat'l Res. v. United States ex rel. Stevens*,
529 U.S. 765 (2000) .......... 43

*In re Wash. Mut. Inc.*,
741 F. App'x 88 (3d Cir. 2018) ....................41

*United States ex rel. Wilkerson v. Allergan Ltd.*,
2024 WL 1242989 (N.D. Ill. Mar. 22, 2024)....................27, 29

*United States ex rel. Young v. Suburban Homes Physicians*,
2017 WL 6625940 (N.D. Ill. Dec. 28, 2017)....................24

*United States ex rel. Zafirov v. Florida Medical Associates*,
2026 WL 2581886 (11th Cir. Sept. 1, 2026) ....................44

*Zavala v. Wal-Mart Stores, Inc.*,
393 F. Supp. 2d 295 (D.N.J. 2005)....................27

*U.S. ex rel. Zwirn v. ADT Sec. Servs., Inc.*,
2014 WL 2932846 (D.N.J. June 30, 2014)....................34

*United States ex rel. Zylberberg v. Maimonides Med. Ctr.*,
2023 WL 6292538 (E.D.N.Y. Sept. 27, 2023) ....................15

**Constitution**

U.S. Const. art. II, § 1 ....................45

U.S. Const. art. II, § 3 ....................45

**Statutes**

28 U.S.C. § 1404(a) ....................7

False Claims Act, 31 U.S.C. §§ 3729–3733

31 U.S.C. § 3729(a)(1)(A) ....................8

31 U.S.C. § 3729(a)(1)(B) ....................8

31 U.S.C. § 3729(a)(1)(C) ....................8, 35

31 U.S.C. § 3729(a)(1)(G) ....................8, 36, 37

31 U.S.C. § 3729(b) ....................36

31 U.S.C. § 3730(b)(1) ....................43

31 U.S.C. § 3730(c)(2)(A) ....................46

31 U.S.C. § 3730(h) ....................8, 10, 37, 38

The Anti-Kickback Statute, 42 U.S.C. § 1320a-7b

42 U.S.C. § 1320a-7b .......... 9

42 U.S.C. § 1320a-7b(b)(2)(A) .......... 14

42 U.S.C. § 1320a-7b(b)(2)(B) .......... 13

42 U.S.C. § 1320a-7b(b)(3)(A) .......... 24

42 U.S.C. § 1320a-7b(g) .......... 9, 30

42 U.S.C. § 1395k(a)(2)(F) .......... 6

**Regulations and Rules**

42 C.F.R. § 416.2 .......... 6

42 C.F.R. § 416.164(a)(8) .......... 6

42 C.F.R. § 416.195 .......... 6

89 Fed. Reg. 59186, 59190 (July 22, 2024) .......... 6

Fed. R. Civ. P. 12(b)(2) .......... 7

Fed. R. Civ. P. 12(b)(6) .......... 42

Fed. R. Civ. P. 8(a) .......... 11, 12

Fed. R. Civ. P. 9(b) .......... *passim*

Tex. R. Civ. P. 11 .......... 11, 41

## INTRODUCTION

Relator Lafe Ball filed this *qui tam* action three years ago against his former employer, Alcon Vision, LLC, and two other Alcon companies. Alcon Vision is an eye care company based in Texas that sells surgical devices and provides maintenance services for those devices. In a sealed Complaint, Relator alleged that he was fired for voicing concerns about how "Alcon"—he doesn't specify which Alcon entity—prices its service contracts. Relator claimed that Alcon Vision, together with Alcon Inc. and Alcon Laboratories, Inc., violated the False Claims Act ("FCA") by (i) discounting service contracts to induce doctors to buy "Alcon" intraocular lenses, in breach of the Anti-Kickback Statute (the "AKS Theory"), (ii) over-charging the Department of Veterans Affairs (the "VA Theory"), and (iii) retaliating against him.

Fast forward to today, and the United States has declined to intervene in this action; the Court has unsealed this case; and Relator has amended his complaint. As a result, Relator standing alone must now convince this Court that his allegations suffice to state claims under the FCA. Relator cannot carry that burden, and all of his claims should be dismissed with prejudice.

Relator worked for years at Alcon Vision and has had three years since commencing this action to prepare his Amended Complaint. But after all that time and two complaints, he still has not pled any fraud scheme. The reason is simple: there was none. Properly disclosed discounts, like the ones Alcon Vision offered its customers, do not violate the AKS, and Alcon Vision has never "overcharged" the VA for equipment service. That is why Relator cannot muster any of the factual allegations required to claim that defendants provided unlawful discounts, intended to break the law, caused false claims to be submitted, or resulted in loss to the Government. And it is why he resorts to speculation and conclusory assertions at every turn.

Relator's retaliation claim fares no better. While this case was under seal, Relator ran to Texas and told a different story. There, Relator sued Alcon Vision for retaliation a second time.

But, Relator claimed that Alcon Vision fired him, not for voicing concerns about service pricing and alleged kickbacks, but because he would not discipline a coworker who had complained about their boss.

Relator's inability to plead the factual allegations critical to his claims runs through the entirety of his Amended Complaint and, as set out below, is fatal to each of his five FCA claims.

**The AKS Theory (Counts I-IV).** The AKS Theory fails at every element.

*First,* Relator has not alleged the elements of an AKS violation. ***Scienter.*** The AKS is a criminal statute that requires proof that a defendant specifically intended to act unlawfully. But the Amended Complaint never alleges that anyone at any Alcon entity believed the company's service pricing was unlawful, let alone that they intended to break the law. *See infra* § I.A.1. ***Inducement***. The Amended Complaint does not allege any facts showing that "Alcon" intended to induce the sale of any federally reimbursed product by offering service discounts. *See infra* § I.A.2. ***Remuneration***. Relator's allegations support that the AKS permitted Alcon Vision's service discounts because they were consistent with fair market value and an expressly protected statutory exception. Thus, Relator has failed to allege remuneration under the AKS. *See infra* § I.B.

*Second,* Relator's allegations do not satisfy Rule 9(b). *See infra* § I.C. Fraud must be pled with particularity, and a relator bringing an FCA claim must plead detailed facts plausibly establishing that the defendant's conduct caused the submission of false claims. Relator claims a "scheme," but he never details it. He references a few customers who requested discounts, but he offers no factual allegations—just conclusory assertions—to establish that those customers received a discount for an unlawful purpose and submitted "false" claims because of it, let alone that these isolated customer experiences were emblematic of some "nationwide" scheme.

*Third,* Relator has not pled the independent elements of an FCA claim. ***Falsity***. Just as Relator's allegations are insufficient to satisfy Rule 9(b), they are insufficient to plausibly establish that any false claim was ever submitted to Medicare. *See infra* § I.D.1. ***Materiality & Loss***. Finally, Relator cannot claim that Alcon Vision caused any loss to the Government, or that its service discounts would have been material to the Government's payment of any particular Medicare claim. That is because the Government pays a fixed rate for cataract surgeries regardless of the type or brand of IOL used and does not reimburse the cost of servicing surgical equipment. *See infra* § I.D.2.

**The VA Theory (Counts I-IV).** Relator alleges that he had access to every VA service contract during his tenure at Alcon Vision, and he asserts that, on more than one occasion, "Alcon" charged the VA more for service than it typically charged private businesses. Yet, Relator has not pled the details of any of those transactions—save one. And as to that one transaction, the Amended Complaint shows that the VA actually paid the same price for service as private businesses.

Relator evidently believes that one or more defendants violated the FCA by not giving the VA the same private-customer discounts he now claims were unlawful. But how? Relator identifies no contract term, statute, or regulation that entitled the VA to any given price or discount. Yet, without that, Relator has no legal basis to claim "Alcon" fraudulently overcharged the VA and violated the FCA. *See infra* § II.

**Conspiracy (Count III).** Relator claims that Alcon Vision, Alcon Laboratories, and Alcon Inc. "conspired" to violate the FCA. But the intracorporate conspiracy doctrine bars this claim because a parent company and its subsidiaries cannot conspire with each other. Regardless, Relator has not even tried to plead the elements of a conspiracy claim—that defendants reached

an agreement among themselves with the specific intent to defraud the Government. *See infra* § III.

**Reverse FCA Claim (Count IV).** Relator tries to assert a claim under the FCA's reverse false claims provision. But the case law is clear that this claim fails because it rests on the same allegations as Relator's other claims and is therefore impermissibly duplicative. *See infra* § IV.

**Retaliation (Count V).** Relator's retaliation claim fails in the first instance because it depends on allegations that he has since expressly contradicted in another proceeding. But that is not the only defect. Relator asserts this count against "all Defendants," but he alleges that only Alcon Vision retaliated against him. And even if the Court could credit Relator's allegations, they do not show that he engaged in protected conduct or that he was disciplined for doing so, and they could not revive a claim that Relator released when he settled the Texas litigation. *See infra* § V.

**Unconstitutionality (Counts I-IV).** Finally, Relator seeks to prosecute claims for treble damages and civil penalties that belong to the United States alone. But it is unconstitutional for a private citizen, who has not been appointed consistent with Article II, to wield core Executive power and to do so with little to no Executive control and oversight. *See infra* § VI.

*   *   *

The Court should dismiss the Amended Complaint with prejudice. *See infra* § VII. Relator had access to all relevant facts during his years with Alcon Vision, and he has had three more years to develop his allegations. Yet, the most he could muster was a handful of conclusory, boilerplate allegations that leave intact every material pleading deficiency in his original complaint. There is no basis to grant Relator another amendment, and every reason to bring this case to a close.

## BACKGROUND

### A. The Parties

The Alcon group of companies is a global leader in eye care. AC ¶ 4. Alcon Laboratories, Inc. ("Alcon Laboratories") is a subsidiary of Alcon Inc.[1] *Id.* ¶ 5. Alcon Vision, LLC ("Alcon Vision") is an indirect subsidiary of Alcon Laboratories. *Id.* Relator Lafe Ball served as Alcon Vision's Director of United States Service Operations from June 2018 through February 2023. *Id.* ¶ 2.

Alcon Vision is headquartered in Fort Worth, Texas, and sells FDA-regulated surgical, pharmaceutical, and other vision care-related products in the United States. AC ¶¶ 5, 73–74. Alcon Vision's surgical product portfolio includes complex equipment used in ophthalmic surgeries, including cataract, refractive, and retinal procedures. *Id.* Alcon Vision is also a leading manufacturer of surgical consumables and implantables used during ophthalmic surgeries, including intraocular lenses (or "IOLs"), prosthetic lenses used as a replacement for the eye's natural lens after cataract removal. *Id.* ¶¶ 5, 43.

Because Alcon Vision's surgical devices are complex machines used in vital medical procedures, it is important to ensure they remain in good working order. Accordingly, Alcon Vision maintains a dedicated equipment service team within its Services Division. *See* AC ¶¶ 2–3. Alcon Vision's surgical devices come with a one-year service period. *Id.* ¶ 76. After this one-year warranty period expires, customers can obtain additional Alcon Vision maintenance and support services on an hourly basis or purchase extended service coverage through a service contract. *Id.* ¶¶ 76–77. These service contracts are executed in writing, disclosing the one-year or

[1] The Alcon Laboratories entity that exists today is different than the one Relator appears to reference in his Amended Complaint, which fully merged into Alcon Vision in February 2019. *See* Dkt. # 60-1, Declaration of Thomas Hudnall ¶¶ 3, 25.

multi-year total price that will be charged to the customer under the contract, the covered service period, the customer's billing frequency, and incorporating the Alcon Terms of Service available on the Alcon website. *See* Ex. A, Declaration of Brian Pierro ("Pierro Decl.") at Exs. 1–4.

Within Alcon Vision, the company's "sales efforts are divided into three separate categories: capital equipment, service, and consumables." AC ¶ 73. The Alcon Vision team that handles equipment service and support, including service contract sales, is distinct from the personnel who sell consumable products like IOLs. *See, e.g.*, *id.* ¶¶ 2–3, 5, 105, 142.

### B. Cataract Surgeries and Medicare Reimbursement

"A cataract is an opacity that develops in the lens of the eye," which can lead to progressive vision changes. AC ¶ 43. "Cataracts are typically detected by optometrists during routine eye care, who then refer patients to an ophthalmic surgeon." *Id.* As part of cataract surgery, a surgeon removes the clouded natural lens of the eye and replaces it with an IOL. *Id.*

Surgeons perform the vast majority of cataract surgeries at ambulatory surgery centers ("ASCs"). *Id.* The Centers for Medicare and Medicaid Services ("CMS") reimburses ASCs for rendering covered services to Medicare beneficiaries through the ASC Payment System under Medicare Part B. *See* 42 U.S.C. § 1395k(a)(2)(F). Under the ASC Payment System, Medicare reimburses ASCs a single bundled payment—at a set and predetermined amount—for each cataract surgery performed. *See* AC ¶ 46. The predetermined payment amount is set based on hospital cost reporting data submitted under the Healthcare Cost Report Information System. *See* 89 Fed. Reg. 59186, 59190 (July 22, 2024). It covers "facility services," a category that includes the anticipated cost of a conventional IOL.[2] *See* AC ¶¶ 45–46; 42 C.F.R. § 416.2, 416.164(a)(8).

[2] There is a premium category of IOLs called Advanced Technology IOLs ("ATIOL"), which have advanced vision-correction attributes. *See* AC ¶ 47. For example, some ATIOLs may correct for additional vision disorders like astigmatism. *See* 42 C.F.R. § 416.195. Medicare typically does not cover the additional cost associated with an ATIOL. AC ¶¶ 47–48.

Importantly, however, the payment is fixed: Medicare pays the same amount for a cataract surgery regardless of the brand or type of conventional IOL implanted. *See* AC ¶ 46. Medicare also does *not* pay to reimburse the cost of servicing the equipment used in cataract surgeries. *See id.* ¶¶ 45–46 (listing what the fixed reimbursement for cataract surgeries encompasses).

### C. LASIK Surgeries and Medicare Reimbursement

LASIK surgery is an elective procedure that utilizes a laser to correct refractive errors such as myopia (i.e., nearsightedness). *See* AC ¶¶ 75, 93. IOLs are not used during LASIK surgery. *Id.* ¶ 93. Because it is an elective procedure, LASIK surgery is not covered by Medicare. *Id.* Alcon Vision has a Refractive Division responsible solely for the sale of equipment and single-use products used in refractive surgery. *See id.* ¶ 123 (referencing the "Refractive Division Manager").

### D. This Action

Relator worked in Alcon Vision's Services Division from 2018 to 2023. AC ¶ 2. Alcon Vision terminated Relator's employment for performance reasons in February 2023. *Id.* ¶¶ 2, 209.

Approximately six months later, on August 31, 2023, Relator filed this *qui tam* action under seal. Dkt. #1. Relator's Complaint named Alcon Vision and Alcon Laboratories, and their ultimate parent company, Alcon Inc., as defendants. *Id.* After investigating Relator's claims, the United States declined to intervene in this proceeding on March 2, 2026. Dkt. # 14. On May 12, 2026, the Court unsealed Relator's Complaint. Dkt. #14–15. On September 2, 2026, in accordance with the Court's order of August 10, 2026 (Dkt. # 41), Alcon Inc. moved to dismiss the complaint under Fed. R. Civ. P. 12(b)(2) for lack of personal jurisdiction, and Alcon Vision and Alcon Laboratories moved pursuant to 28 U.S.C. § 1404(a) to transfer this proceeding to the United States District Court for the Northern District of Texas. Dkt. #42–43. In response, on September 23, 2026, Relator amended his complaint. *See* Dkt. #54.

The Initial Complaint lumped four provisions of the False Claims Act, 31 U.S.C. § 3729 *et seq*., into a single Count I, and stated a second Count II for FCA Retaliation. The Amended Complaint separated the four FCA provisions out into four separate Counts and now asserts a total of five Counts under the FCA as follows:

- Count I ("False Claims") alleges that Defendants caused false claims to be presented to the Government for payment or approval under § 3729(a)(1)(A). AC ¶¶ 210–18.
- Count II ("False Statements") claims that Defendants caused false statements to the Government that were material to false claims under § 3729(a)(1)(B). AC ¶¶ 219–26.
- Count III ("Conspiracy") incorporates Relator's other allegations and alleges that Defendants conspired together to violate the FCA under § 3729(a)(1)(C). AC ¶¶ 227–32.
- Count IV ("Reverse False Claims") asserts a reverse FCA claim, alleging that Defendants knowingly and improperly avoided or decreased an obligation to pay or transmit money to the Government under § 3729(a)(1)(G). AC ¶¶ 233–39.
- Count V ("Retaliation") alleges that Defendants violated the FCA's retaliation provision in § 3730(h). AC ¶¶ 240–45.

While the Amended Complaint, like the original Complaint, asserts all claims "[a]gainst [a]ll Defendants," and lumps all three Defendants together as "Alcon" throughout, (*see* AC at 1, 52–56 (defining "Alcon" as Alcon Vision, Alcon Laboratories, and Alcon Inc.)), the Amended Complaint attempts to clarify that Relator attributes all pled conduct before 2019 to Alcon Laboratories and all conduct after 2019 to Alcon Vision. *Id.* ¶ 71. Yet some of his allegations then fail to specify a time period. *See id.* ¶ 205 (alleging vaguely that "[w]hile employed by Alcon, Relator raised compliance concerns"). And as for Alcon Inc., the Amended Complaint concedes that "Alcon Inc. was not the entity that directly engaged in" the alleged conduct. *Id.* ¶ 72. Relator, a former Alcon Vision manager, had sufficient information to know that before filing suit. Nevertheless, despite being informed that Alcon Inc. is a Swiss holding company with no ties to this case—and not, as he initially alleged, a Texas company—Relator has refused to drop Alcon Inc. as a defendant. *Id.* ¶ 72. Relator's sole justification is his conclusory assertion, "upon

information and belief," that Alcon Inc. "directed and/or controlled Alcon Laboratories, Inc.'s and Alcon Vision, LLC's conduct discussed herein[.]" *Id.* Yet he offers no facts to support his "belief."

Relator advances two theories as to how "Alcon" allegedly caused false claims or false statements in violation of the FCA. Under his AKS Theory (relevant to Counts I–IV), Relator alleges that Alcon violated the Anti-Kickback Statute ("AKS"), 42 U.S.C. § 1320a-7b, by offering six specific customers discounts on their service contracts during negotiations to renew those service contracts and, in one case, waived certain fees related to renewing a seventh customer's service contract. AC ¶¶ 57, 146, 161. Despite alleging that his manager characterized at least one of the alleged discounts as an "exception," Relator alleges more generally, but without elaboration, that these discounts were part of a larger "scheme." *Id.* ¶ 57. Relator claims that the alleged discounts and fee waivers violated the AKS because "Alcon" hoped that customers who received them would later purchase, or continue purchasing, Alcon IOLs, and the AKS prohibits offering "remuneration" to induce referrals or recommendations of an item or service that may be covered by Medicare. *Id.* ¶¶ 51–55, 57, 146, 161. According to Relator, any claims those providers later submitted to Medicare for cataract surgeries that used an Alcon IOL were "false or fraudulent" within the meaning of the FCA because they included items or services "resulting from" a violation of the AKS. *Id.* ¶¶ 55–56, 59 (quoting 42 U.S.C. § 1320a-7b(g)). Though Relator identifies a handful of customers to whom "Alcon" allegedly offered discounts or a fee waiver, he does not specifically allege that a single one of those customers was enrolled with Medicare, let alone that one of the customers was reimbursed by Medicare for cataract surgeries using an Alcon IOL. *See id.* ¶¶ 107–39, 157–58. Relator only speculatively claims "on information and belief" that Alcon IOLs were used "in surgeries for Medicare beneficiaries." *Id.* ¶¶ 121, 131, 140, 160.

Relator's second theory—the VA Theory (relevant to Counts I–IV)—is that "Alcon defrauded the Government" by charging the VA an allegedly inflated "list price" for service contracts rather than a discounted price. *See* AC ¶¶ 65, 178–203. Yet, Relator does not identify a single law or contract term that required "Alcon" to offer discounts to the VA such that its failure to do so is actionable under the FCA. And, with one exception, he does not describe any VA service contracts. In his one example, Relator alleges that "Alcon" charged the VA "between $31,362.50 and $32,500.08 annually" to service EX500 devices in 2022. *Id.* ¶ 200. That price, however, is not an inflated "list price." Per Relator's own allegations, it was less than (or equal to) the "target price" that "Alcon" had set for "its private sector customers" four years prior. *See id.* ¶¶ 185–86.

Finally, Relator claims in Count V that "Alcon" retaliated against him for engaging in conduct protected by the FCA. *See* AC ¶ 241 (citing 31 U.S.C. § 3730(h)). Relator alleges that, at some unspecified time and to some unspecified Defendant, he "raised compliance concerns regarding Alcon's provision of service discounts and waiver of fees" and "reported internally to his managers that overcharging the Government" was "unethical" and "improper and illegal." *Id.* ¶¶ 188, 205–06. Relator alleges that after "pushback and criticism," Alcon Vision put him on a performance improvement plan ("PIP") in November 2022 and terminated his employment in February 2023 "due to 'performance issues.'" *Id.* ¶¶ 2, 208–09. Relator asserts that the concerns regarding his performance were illegitimate. *Id.* ¶¶ 208–09.

### E. Relator's Overlapping Texas Litigation & The Parties' Settlement

In January 2024, months after filing this *qui tam* action, Relator filed suit against Alcon Vision in the 141st Judicial District Court in Fort Worth, Texas. *See Ball v. Alcon Vision, LLC*, No. 141-349539-24 (Tex. Dist. Ct. 2024). There, Relator asserted a claim under state law for

retaliation and repeated his claim that Alcon Vision had retaliated against him. *See* Ex. B, Declaration of Ilene Albala ("Albala Decl.") ¶ 2 & Ex. 1 (Complaint, *Ball v. Alcon Vision, LLC*).

In Texas, Relator told an entirely different story about the alleged retaliation and his termination. His complaint said nothing about suffering retaliation in response to raising concerns about service contracts. Instead, Relator alleged that he was placed on a PIP and then terminated for refusing to discipline another employee after she filed a complaint against a supervisor for making derogatory comments. *Id.* ¶¶ 14–23, 33 (alleging that Alcon Vision retaliated solely "because of" his "opposition to discriminatory employment practices").

The Texas litigation proceeded through discovery before the parties participated in mediation in January 2025. At the end of the mediation, Relator and Alcon Vision executed a binding Mediation Settlement Agreement under Rule 11 of the Texas Rules of Civil Procedure. *See* Albala Decl. Ex. 3 (Mediation Settlement Agreement, *Ball v. Alcon Vision, LLC*). As part of the settlement, Relator agreed to a "full and complete release in favor of Alcon [Vision] and all of those in privity with Alcon [Vision] relating to the subject matter of the Lawsuit and all disputes between them, whether the subject of the Lawsuit or not[.]" *Id.* ¶ 2.

## LEGAL STANDARD

To survive a motion to dismiss, an FCA relator must both state a claim to relief that is plausible on its face under Rule 8(a) and plead the alleged fraud with particularity under Rule 9(b). *Universal Health Servs., Inc. v. United States*, 579 U.S. 176, 195 n.6 (2016). Rule 9(b) requires the relator to "inject[] precision" into and "substantiat[e]" his "allegations of fraud." *United States ex rel. Hunter v. Fillmore Cap. Partners, LLC*, 2024 WL 1051971, at *6 (E.D. Pa. Mar. 11, 2024), *aff'd*, 2025 WL 971668 (3d Cir. Apr. 1, 2025). "[O]ffer[ing] only an overview of a scheme, with no accompanying factual explanation of how and whether any false claims were actually submitted," is insufficient. *Id.* And facts that could "plausibly have either a legal or illegal

explanation" cannot give rise to an inference of fraud. *United States ex rel. Silver v. Omnicare, Inc.*, 903 F.3d 78, 92 (3d Cir. 2018).

Even for allegations governed solely by Rule 8(a), a court disregards "naked assertions" and "legal conclusions" masquerading as factual allegations. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Rather, a plaintiff must plead sufficient facts to "raise a right to relief above the speculative level," *United States ex rel. Petras v. Simparel, Inc.*, 857 F.3d 497, 501–02 (3d Cir. 2017), and allow the court to infer "more than the mere possibility of misconduct[.]" *Iqbal*, 556 U.S. at 678.

## ARGUMENT

The problems with the Amended Complaint are legion. Independently and collectively, those problems provide numerous bases for dismissal of all claims with prejudice.

*First*, neither Relator's AKS Theory nor his VA Theory withstands scrutiny, and thus all four of his substantive FCA claims (Counts I-IV) fail. Relator's AKS Theory fails on three independent grounds: (i) he does not allege the required elements of an AKS violation, (ii) he does not allege that an AKS violation resulted in the submission of false claims, and (iii) he does not allege that "Alcon's" conduct violated the FCA. *See infra* § I. Meanwhile, Relator's VA Theory fails twice over: Relator offers no support to suggest that a purported "overcharge" is an FCA violation, and Relator provides nothing to support his naked assertion that "Alcon" ever *did* "overcharge" the VA. *See infra* § II. In fact, the one "example" Relator offers rebuts his assertion and demonstrates that the VA's service pricing was in line with what "Alcon" typically charged.

*Second*, Relator's conspiracy, reverse FCA, and retaliation claims (Counts III-V) fail for their own independent reasons. The intracorporate conspiracy doctrine bars Relator's conspiracy claim (Count III), and even if it did not, Relator has not pled the unlawful agreement or specific intent that a conspiracy requires. *See infra* § III. Relator's reverse FCA claim (Count IV) is not cognizable because it impermissibly duplicates Relator's other claims. *See infra* § IV. And

Relator both contradicted and released his retaliation claim (Count V) through the Texas litigation. Even without those fatal defects, Relator has not properly alleged that he engaged in protected conduct under the FCA or was disciplined for doing so. *See infra* § V.

Finally, Relator has no constitutional authority to prosecute a declined *qui tam* in the name of the United States. *See infra* § VI.

The Court should dismiss with prejudice. *See infra* § VII. Relator has amended his complaint once already, and he cannot plead around the fundamental problems that pervade his claims.

## I. THE AMENDED COMPLAINT FAILS TO PLEAD AN FCA CLAIM PREDICATED ON ALLEGED AKS VIOLATIONS (COUNTS I–IV).

Relator's FCA/AKS theory fails multiple times over. *First*, to plead an AKS violation, Relator must plausibly allege that an Alcon Defendant (i) knowingly and willfully; (ii) offered or paid prohibited remuneration; (iii) to induce purchases of goods or services; (iv) that a federal health care program paid for. 42 U.S.C. § 1320a-7b(b)(2)(B); *see United States ex rel. Greenfield v. Medco Health Sols., Inc.*, 880 F.3d 89, 94–95, 98 (3d Cir. 2018). But Relator does not plausibly allege scienter because he has not alleged that any Defendant knew that its conduct was unlawful and that it intended to violate the law. *See infra* § I.A.1. Nor has he pled inducement: The Amended Complaint has no facts that, if true, demonstrate a plausible instance where "Alcon" approved and offered a service contract discount, and that "Alcon" did so to induce that customer to purchase IOLs. *See infra* § I.A.2. And the Amended Complaint fails to sufficiently demonstrate that "Alcon's" service pricing constituted prohibited remuneration. *See infra* § I.B.

*Second*, the Amended Complaint fails to establish that any AKS violation by any of the Alcon Defendants resulted in the submission of a false claim to Medicare. The Amended Complaint does not include any particularized factual allegations that show a plausible link

between discounts for service contracts and subsequent Medicare claims. It therefore lacks any "reliable indicia" that could "lead to a strong inference" that providers actually submitted false claims to Medicare. *Foglia v. Renal Ventures Mgmt., LLC*, 754 F.3d 153, 156 (3d Cir. 2014); *see infra* § I.C.

*Third*, Counts I–IV should be dismissed because the Amended Complaint fails to plead facts to allege a plausible FCA claim, which requires a showing of FCA scienter, falsity, causation, and materiality. *See United States ex rel. Petratos v. Genentech Inc.*, 855 F.3d 481, 487 (3d Cir. 2017). Given that Relator has not alleged with particularity the submission of any false claims, he has also not pled the falsity element of an FCA claim. *See infra* § I.D.1. And Relator has not alleged, and could not allege, that "Alcon's" service pricing was material to the Government because that service pricing had no effect on Medicare reimbursement. *See infra* § I.D.2. For similar reasons, Relator has not alleged any loss to the Government. *See id.*

For each and all of these reasons, Relator's AKS Theory cannot sustain Counts I–IV.

## A. Relator's FCA Claims Based on His AKS Theory Fail Because He Has Not Sufficiently Alleged AKS Scienter or Inducement.

### 1. Relator has not alleged scienter.

The AKS is a criminal statute. Therefore, it contains a demanding "knowingly and willfully" scienter requirement to avoid criminalizing potentially innocent conduct. 42 U.S.C. § 1320a-7b(b)(2)(A). This stringent standard requires that Relator plead facts to establish a defendant actually knew that "[its] conduct was unlawful and intended to do something the law forbids." *United States v. Gilead Scis., Inc.*, 2025 WL 2627686, at *13 (E.D. Pa. Sept. 11, 2025) (citing *United States v. Goldman*, 607 F. App'x 171, 174 (3d Cir. 2015)).

This requirement has real bite at the pleading stage. Relator must allege facts showing a plausible inference that each Alcon defendant knew that its actions were unlawful and that each

Defendant intended to act unlawfully. *United States ex rel. Dietz v. Philips Respironics*, 2026 WL 975740, at *5 (W.D. Pa. Feb. 23, 2026) (citing *United States ex rel. Pilecki-Simko v. Chubb Inst.*, 443 F. App'x 754, 760, n.17 (3d Cir. 2011)). Relator comes nowhere close to meeting his burden.

The Amended Complaint contains just two allegations relevant to scienter, neither of which is sufficient. *First*, Relator alleges that, at some unspecified time—and to some unspecified Defendant—he "raised compliance concerns" about "Alcon's" alleged service contract discounts and fee waivers. AC ¶ 205. But Relator does not identify any specific employee he informed, let alone what he told them and when. Moreover, a single employee raising a vague concern does not plausibly show that any Alcon Defendant actually knew that its conduct was unlawful and nevertheless intended to violate the law—particularly absent any allegation that the (unidentified) employee in fact agreed with Relator. *See, e.g.*, *Dietz*, 2026 WL 975740, at *5 (W.D. Pa. Feb. 23, 2026) (allegation that employee voiced "concerns about the practice of providing free" services was insufficient to plead AKS scienter); *United States ex rel. Zylberberg v. Maimonides Med. Ctr.*, 2023 WL 6292538, at *4 (E.D.N.Y. Sept. 27, 2023) (allegation that relator "voic[ed] concerns" that conduct was "improper" did not establish that "defendants themselves believed their conduct violated" the law). Nor does an employer's general knowledge of relevant regulations, or that a particular practice could theoretically be considered remuneration establish that an employer knew its own practices did not comply with the law. *See Gilead*, 2025 WL 2627686, at *13 (company's general knowledge that speaker programs *could* violate the AKS did not mean that company knew its own speaker programs were noncompliant).

*Second*, Relator alleges that Barb Barr, "Alcon's" Associate Director for U.S. Monitoring,[3] once emailed Relator a chart containing two columns titled "Compliance Risk Area" and

[3] Relator does not allege which entity employed Ms. Barr during the relevant time period.

"Ranking." AC ¶ 176. The chart lists seventeen "Risk Areas," one of which was "Items of Value (e.g., anatomical model)" and the "Ranking" listed next to that item states "Discounts on Service Plans to assure consumable sales." *Id.* Relator offers essentially nothing to explain the email—what prompted it, any discussion that ensued, what the reference to service plan discounts meant, or how the topic was "rank[ed]." Moreover, the chart itself says nothing about whether the employee who allegedly sent it, or anyone else, thought that "Alcon" was actually engaged in the referenced conduct and, if so, whether that person thought Alcon was doing anything wrong. All the alleged email contains is a single line with a vague reference to one topic in a document that otherwise covered numerous other items. This threadbare allegation is insufficient to support an inference that "Alcon" knowingly and willfully violated the law. *United States ex rel. Hart v. McKesson Corp.*, 96 F.4th 145, 161 (2d Cir. 2024) (document covering range of topics, including the at-issue practice, did not plausibly support "that the email's sender or recipient believed that [defendant's practices were] unlawful or that [company-defendant] shared such a view"); *United States ex rel. Omni Healthcare, Inc. v. Exagen, Inc.*, 2025 WL 959460, at *9 (D. Mass. Mar. 31, 2025) (complaint failed to allege AKS scienter where it relied primarily on "conclusory statements" and a defendant's single "fleeting reference" to the issue); *United States ex rel. Long v. Janssen Biotech, Inc.*, 2026 WL 2949353, at *29 (D. Mass. Sept. 30, 2026) (no AKS scienter based on evidence that compliance officers merely circulated internal warnings about compliance risk without evidence that any employee believed the company's programs, as implemented, violated the law).

The Second Circuit's recent *McKesson* decision is instructive. The relator there, a former business development executive of the defendant, alleged that he had developed concerns about McKesson offering "hugely valuable" business management tools to healthcare providers for free.

96 F.4th at 151–52, 160–61. He alleged that he had emailed his supervisors about his concerns; that one executive emailed another executive a document with a reference to the tools stating, "You didn't get this from me … ok?"; and that McKesson destroyed relevant documents during the Government's subsequent investigation. *Id.* at 160. The Second Circuit held that these allegations were insufficient to plausibly allege that McKesson had acted "knowingly and willfully" under the AKS. *Id.* at 160–62. To start, the relator in *McKesson*, like Relator here, had not alleged facts showing "that his supervisor agreed with him" or that others had "shared [his] concerns." *Id.* at 161. But even if relator had alleged that much, those allegations would still not have established that McKesson had intended to violate the law absent additional facts showing that relator's concerns were widely shared by others or that the views of any such employee(s) could "be imputed to McKesson as a whole." *Id.*

Relator alleges far less than the relator in *McKesson*, but the core problem is the same: the Amended Complaint does not allege that any employee at any of the three Alcon Defendants agreed with Relator's purported "concerns," let alone establish that, if they existed, their views could be imputed to "Alcon" as a whole. *Id.*; *see also Dietz*, 2026 WL 975740, at *4–5 (vague allegations that unnamed sales managers "knew" practices were illegal and that former sales manager-relator "shared concerns about the" practices were insufficient to allege scienter).

In fact, Relator himself concedes that his allegations fall short of supporting AKS scienter. Relator alleges that "Alcon" acted "reckless[ly]" by allowing service contract discounts if there was a "legitimate business reason for doing so," (AC ¶ 177)—but recklessness does not satisfy the statute's scienter requirement. *See United States ex rel. Klaczak v. Consol. Med. Transp.*, 458 F. Supp. 2d 622, 626 (N.D. Ill. 2006) (the AKS has a "heightened" scienter requirement). Moreover, there is no basis for characterizing this alleged policy as "reckless" when discounts are entirely

permissible under the AKS. *See infra* § I.B.; *see also, e.g.*, *United States ex rel. Gharibian v. Valley Campus Pharmacy, Inc.*, 2021 WL 5406148, at *3 (C.D. Cal. Oct. 12, 2021) (dismissing AKS claims for lack of scienter where the allegations did not indicate that "[d]efendants *knew* that their offer of free … services was unlawful"); *United States ex rel. Switzer v. Wood*, 2024 WL 3742713, at *5 (S.D. Ga. Aug. 9, 2024) (dismissing complaint for lack of AKS scienter); *United States ex rel. Suarez v. AbbVie Inc.*, 2019 WL 4749967, at *13–14 (N.D. Ill. Sept. 30, 2019) (same).

**2. Relator has not pled the required element of AKS inducement with requisite particularity under Rule 9(b).**

Relator must plead with particularity that one purpose of the alleged discounts and fee waivers was to induce purchases of federally reimbursed items. *See United States ex rel. Perri v. Novartis Pharms. Corp.*, 2019 WL 6880006, at *16–17 (D.N.J. Feb. 21, 2019) (applying Rule 9(b)'s particularity standard to inducement element); *United States ex rel. Jensen v. Genesis Lab'y*, 2025 WL 615480, at *15 (D.N.J. Feb. 26, 2025) (same). That is particularly true where, as here, the relator is an "insider." *Perri*, 2019 WL 6880006, at *17. Relator must point to "precis[e]" facts that "substantiat[e]" his conclusion that an Alcon Defendant intended alleged discounts to induce a customer's Medicare business. *Id.* at *7, 17. Relator fails to do so here. *See id.* at *16-17 (a "conclusory" assertion that the defendant provided discounts "for the purpose of inducing continued" Medicare business does not pass Rule 9(b)).

Despite allegedly having participated in the alleged contract negotiations, Relator merely repeats a conclusory assertion that the alleged discounts were "inducement" for IOL purchases. *See, e.g.*, AC ¶¶ 57–58, 85, 89, 91, 100. Rather than provide factual support, Relator alleges only that he received a handful of emails from sales employees *requesting his* approval to offer discounts or fee waivers to seven customers. *Id.* ¶¶ 112, 118–19, 126–28, 130–34, 137–38, 158. But as to each such customer, Relator does not allege a single communication or particular facts

about the rationale for approving any requests. *See id.* ¶¶ 107–17 (not alleging why or even whether employee's alleged discount requests related to customers Brighton and Dutchess were approved), ¶ 119 (alleging merely that Relator's supervisor "approve[d]" a discount for customer St. Lukes, with no allegations regarding the supervisor's explanation), ¶¶ 123–30 (failing to allege who approved alleged discounts for customers Woodhams and New Vision and why), ¶¶ 136–39 (alleging "senior management intervened" to approve an alleged discount for customer Williams' Eye without alleging why they did so), ¶¶ 143–44 (alleging Relator was informed "via email" that Alcon offered service contract discounts to "GPO members" without alleging facts about why), ¶¶ 157–59 (alleging an employee requested a "check out fee" waiver for customer Kadrmas, but not whether it was approved and, if so, why).

Nor does the Amended Complaint allege facts from which this Court could infer that individual sales employees' intent in requesting these alleged discounts can be imputed to any Alcon Defendant as a whole, particularly when these employees lacked the authority to approve and offer any discounts. *See In re Celgene Corp., Inc. Sec. Litig.*, 747 F. Supp. 3d 748, 799 (D.N.J. 2024) (holding employee's scienter could not necessarily be imputed to company absent indication that his scienter was "linked up" to his corporate duties); *cf. United States ex rel. Dones v. Harlingen Med. Ctr.*, 701 F. Supp. 3d 636, 651 (S.D. Tex. 2023) (employees' knowledge must relate to matters within the scope of their authority to impute scienter).

The minimal allegations Relator does provide refute his underlying theory. To start, Relator himself alleges that providing individual service discounts was an "exception" in practice, and that "Alcon" required a "legitimate 'business reason' for" doing so. AC ¶¶ 119, 174.[4] These

[4] While Relator also alleges that, "according to" him, the "legitimate business rational[e]" was "to protect, gain, or increase a customer's" other purchases, he offers no factual support for his interpretation, such as, a copy of the policy or an alleged example of the policy being

allegations suggest that employees responsible for approving discounts and fee waivers believed there *was* a "legitimate business rationale" (AC ¶ 174) for them—particularly where "Alcon" did not condition any alleged discounts or fee waivers on the recipients' federal healthcare business. *United States ex rel. Ruscher v. Omnicare, Inc.*, 663 F. App'x 368, 374 (5th Cir. 2016); *see also Gilead*, 2025 WL 2627686, at *15 (it must be "clear that the remunerations were designed specifically to encourage claims to Medicare."); *United States v. Novo Nordisk, Inc.*, 2024 WL 3582417, at *15 (W.D. Wash. July 30, 2024) (complaint failed to plead inducement where contract did not make "discount contingent on" referrals). These allegations entirely undermine Relator's theory of illegality.

Even putting that aside, "[t]here is no AKS violation" where a defendant might "hope[] or expect[] referrals from benefits that were designed wholly for other purposes"—for example, taking steps to avoid "aggravating" customers in the middle of "contract negotiations." *Omnicare, Inc.*, 663 F. App'x at 374. Yet that is all Relator alleges here. The Amended Complaint states that employees were avoiding "creat[ing] too much angst" with customers during the precise negotiations that form the basis of Relator's AKS theory. AC ¶¶ 112, 114 (alleging employee made such statement while negotiating Dutchess and Brighton contract renewals), *see also id.* ¶ 119 (alleging customer St. Lukes was negotiating a contract renewal), ¶ 123 (alleging "Refractive Division Manager" requested service contract discounts on LASIK equipment New Vision and Woodhams had just purchased), ¶ 137 (alleging employee requested whether Alcon could provide a "more holistic offering" for service pricing for Williams Eye's 11 pieces of capital equipment),

---

communicated. *Id.* ¶ 175. Relator must plead inducement with particularized facts, not by asking this Court to simply credit his bare conclusions. *See Perri*, 2019 WL 6880006, at *17.

¶ 157 (alleging customer Kadrmas was angered by "Alcon" trying to charge a fee associated with service contract renewal).

Finally, some of Relator's examples of alleged unlawful conduct make no sense. For example, Relator points to emails involving customers New Vision and Woodhams where a "Refractive Division Manager" referenced those customers' "Refractive footprint." AC ¶¶ 127–28. Relator contends that the emails reference "refractive procedure estimates" because "the more procedures" performed, "the more IOLs and surgical supplies they will purchase." *Id.* ¶ 128; *see also id.* ¶ 130. But there is no dispute that refractive (LASIK) surgery does not involve IOLs; cataract surgery does. *See id.* ¶¶ 43–49. Likewise, Relator alleges that "Alcon's" "Refractive Service Pricing Promotion" was meant to "convert customers … to Alcon's IOLs," but this conclusion likewise makes no sense, and it is contradicted by the face of the promotion. *Id.* ¶ 132. The promotion states that any discounts "[r]equire[d] approval of *Refractive* Division Manager and Head *Refractive* Sales and Marketing," and the eligibility requirements included "new laser purchases," purchase of an FS200 (LASIK equipment), or an update to an EX500 (LASIK equipment). *Id.* (emphasis added); *see also id.* ¶ 75 (alleging the EX500 and FS200 were used for LASIK surgery). The promotion says nothing about cataract surgery or IOLs, nor the involvement of any cataract sales employees in approving any discounts.[5] And, as Relator acknowledges, LASIK surgery "is not covered by Medicare." *Id.* ¶ 93. These allegations cannot be squared with "Alcon's" inducement theory and should be rejected. *Davis v. Abington Mem'l Hosp.*, 2012 WL 3206030, at *6 & n.63 (E.D. Pa. Aug. 7, 2012) (explaining that internal inconsistencies render

[5] The program also makes perfectly good business sense. It is less costly for Alcon to service multiple pieces of equipment at a time than to service a customer with a single piece of equipment.

allegations deficient and prevent the court from making inferences in a plaintiff's favor); *Chong v. 7-Eleven, Inc.*, 2019 WL 1003135, at *4 (E.D. Pa. Feb. 28, 2019) (similar).

### B. The Amended Complaint does not sufficiently allege illegal remuneration

Where, as here, Relator alleges that "Alcon" engaged in a scheme to violate the AKS by offering service contract discounts and fee waivers, Relator must "allege with particularity," under Rule 9(b), "how the [discounted] services [Alcon] provided to physicians constituted illegal remuneration under the AKS." *United States ex rel. Forney v. Medtronic, Inc.*, 2017 WL 2653568, at *4 (E.D. Pa. June 19, 2017). To do so, Relator must do more than plead facts that could "plausibly have either a legal or illegal explanation." *Omnicare*, 903 F.3d at 92. He must instead plead facts conclusively making fraud a "necessary hypothesis." *Perri*, 2019 WL 6880006, at *18.

Relator's allegations independently fail because they are consistent with the conclusion that "Alcon's" alleged service discounts—documented in written contracts executed during ordinary course business negotiations—were not prohibited remuneration subject to the AKS.

#### 1. The Amended Complaint supports that any "discounted" pricing was within fair market value and therefore not remuneration.

Not all services nor price concessions constitute "remuneration" that violate the AKS. "The AKS defines remuneration as including transfers of items or services for free or for other than fair market value." *Gilead*, 2025 WL 2627686, at *6 (cleaned up). Thus, to the extent "Alcon's" alleged discounted service pricing is consistent with fair market value, the alleged discounts do not fall within the ambit of the AKS.

Relator alleges that "Alcon's service contracts typically equate[] to approximately 8% to 15% of the average sales price ['ASP'] of the covered equipment." AC ¶ 77. A plausible, and really the only logical inference from this allegation is that this range constitutes fair market value. *Cf. United States ex rel. Cooper v. Pottstown Hosp. Co., LLC*, 2015 WL 1137664, at *4 (E.D. Pa.

Mar. 13, 2015) (holding relator's AKS allegations were insufficient in part where he failed to allege compensation was inconsistent with fair market value); *United States ex rel. Lewis v. Cmty. Health Sys., Inc.*, 2020 WL 3103994, at *21 (S.D. Fla. June 11, 2020) (relator's allegations were consistent with negotiation of "an arms-length transaction" where relator did not allege exchanges "to be below fair market value"). And Relator's own examples of so-called "discounted" pricing reflect that the alleged discounts were consistent with the fair market value benchmark. For example, Relator alleges that "Alcon" offered a "discounted" price of $30,000 for LenSx service to three customers. AC ¶¶ 107–119. But this falls squarely within the "typical[]" 8–15% ASP range Relator alleges as the general pricing benchmark. *Id.* ¶¶ 74, 77. According to Relator, the ASP for LenSx was $320,000. *Id.* ¶ 74. And 8–15% of that is between $25,600 to $48,000. Relator also alleges that other "Alcon" customers were offered service contracts "at the following annual amounts: EX500 Service: $30,000; FS200 Service: $30,000; and Vario Service: $4,000." *Id.* ¶ 124. Yet this pricing too falls at the high end of the 8–15% ASP range. *Id.* ¶¶ 74, 77 (8–15% ASP for such equipment would amount to: EX500: $17,098–$32,059; FS200: $14,417–$27,032; and Vario: $2,120–$3,975). Relator does not allege facts about a single contract that fell outside the 8–15% ASP range, which he alleges was "typical[]." AC ¶ 77.

Relator's own allegations confirm that, even inclusive of any alleged discounts, the service contracts fell within fair market value and thus did not constitute illegal remuneration under the AKS. Fraud is hardly a "necessary hypothesis" from these allegations. *Perri*, 2019 WL 6880006, at *18; *see also Omnicare, Inc.*, 903 F.3d at 92.

**2. The Amended Complaint supports that any "discounted" pricing was permissible under the AKS's discount protections.**

Congress exempted "discount[s] or other reduction[s] in price" from the AKS "if the reduction in price is properly disclosed and appropriately reflected in costs claimed or charges

made by the provider or entity under a Federal health care program." 42 U.S.C. § 1320a-7b(b)(3)(A) (the "Statutory Discount Exception"). This Statutory Discount Exception shields a seller like "Alcon" where it "properly disclose[s]" and "appropriately reflect[s]" the discount in its charges to the buyer. *United States v. Shaw*, 106 F. Supp. 2d 103, 120 (D. Mass. 2000); *see also United States ex rel. Schroeder v. Hutchinson Reg'l Med. Ctr.*, 2024 WL 4298655, at *17, *24, *29 (D. Kan. Sept. 26, 2024) (a seller "need concern itself solely with" disclosing the discount in the "charges" it "ma[k]es to the buyer"). And a seller need not even state in its charges that the price "was due to a discount" so long as it "accurately report[s] the actual purchase price." *Hutchinson*, 2024 WL 4298655, at *20.

The Amended Complaint affirmatively demonstrates that this exception applies. *See United States ex rel. Collado v. Bracco USA, Inc.*, 2025 WL 1261779, at *1–2 (3d Cir. May 1, 2025) (affirming dismissal where relator failed to plead facts suggesting defendants failed to comply with the statutory discount exception); *cf. United States ex rel. Young v. Suburban Homes Physicians*, 2017 WL 6625940, at *2 (N.D. Ill. Dec. 28, 2017) (holding that "[a] key difficulty with [r]elator's claim" was that the conduct of "referring patients" was not "categorically unlawful" where "the AKS expressly exempts certain referral arrangements from penalties").

Relator alleges that "Alcon's" service charges were documented in written service contracts that were, on their face, "discounted service contracts." AC ¶¶ 76, 107, 113, 117, 121–22, 124, 131–32; *Bracco*, 2025 WL 1261779, at *1. And the service contracts *do* "appropriately reflect[]" the charge to the buyers that Relator contends were a "discount." *Shaw*, 106 F. Supp. 2d at 120; *compare* AC ¶¶ 107–13 (alleging $30,000 LenSx service contracts for Brighton and Dutchess were discounted), ¶¶ 123–24 (alleging customer Woodhams was offered a discounted service contract for annual total price of $64,000), ¶ 119 (alleging St. Lukes Cat. & Laser Institute

requested an alleged discounted service contract for $30,000), *with*, Pierro Decl. Exs. 1–2 (Brighton and Dutchess contracts accurately reflecting annual $30,000 LenSx price), Ex. 3 (St. Lukes Cat. & Laser Institute LenSx service contract accurately disclosing annual price of $30,000), Ex. 4 (Woodhams contract accurately reflecting that monthly payments "less discounts" for equipment service totaled an overall annual price of approximately $64,000).[6] Thus, far from pleading any "reliable indicia" suggesting that "Alcon" did not disclose its alleged discounts, *Bracco*, 2025 WL 1261779, at *2, the Amended Complaint supports the *opposite* inference. *See also United States ex rel. Kyer v. Thomas Health Sys., Inc.*, 178 F.4th 119, 136 (4th Cir. 2026) (relator's AKS theory failed where alleged subsidies were "consistent with lawful explanations").

### C. The Complaint Also Fails to Allege False Claims Submissions with Particularity, Providing Yet Another Basis for Dismissing the AKS Theory.

Relator's Amended Complaint has a separate Rule 9(b) problem: he fails to allege a link between the alleged discounts and claims submissions with the requisite particularity. Relator alleges that "any manufacturer's IOLs can be used in cataract surgery." AC ¶ 90. Despite this, he repeatedly speculates in a single boilerplate allegation that at some unspecified time(s), surgeons submitted Medicare claims for cataract procedures that could have theoretically involved an Alcon IOL. AC ¶¶ 121, 131, 140. That is insufficient.

To meet his burden, Relator must allege "particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted." *Foglia*, 754 F.3d at 156. *And* he must plead facts that show a clear causal "link" between the alleged kickbacks and false claims. *United States ex rel. Headen v. Abundant Life*

[6] This Court may consider the contracts themselves because Relator references the contracts in his Amended Complaint and his claims are based on them. *See, e.g.*, *Schmidt v. Skolas*, 770 F.3d 241, 249 (3d Cir. 2014) (district court may consider documents integral to or relied upon in complaint); *see also Pension Ben. Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993) (court may consider documents "if the plaintiff's claims are based on the document[s]").

*Therapeutic Servs. Texas, LLC*, 2019 WL 1930274, at *6 (S.D. Tex. Apr. 30, 2019) (citing *Greenfield*, 880 F.3d at 98, and holding Rule 9(b) requires pleading a "link" between kickbacks and claims with particularity); *see also U.S. ex rel. Judd v. Quest Diagnostics Inc.*, 638 F. App'x 162, 169 (3d Cir. 2015) (affirming dismissal where relator "provide[d] no reason to believe that" claims were submitted "in connection with . . . kickbacks"); *Greenfield*, 880 F.3d at 94–95 (explaining the "link" requirement applied to false certification FCA claim); *cf. United States ex rel. Johnson v. Bethany Hospice & Palliative Care,* 2020 WL 1542339, at *8 (S.D. Ga. Mar. 31, 2020) (explaining that false claims submissions must be alleged to state a claim under either the presentment or certification provisions of the FCA). Applying these principles here, Relator must allege particular facts to show that: (i) "Alcon" offered an alleged unlawful "kickback" to a practice; (ii) a surgeon from that practice, aware of the "kickback," recommended an Alcon IOL to a patient; (iii) the surgeon implanted the Alcon IOL during the patient's surgery, and (iv) the surgeon submitted a claim for such surgery to Medicare. *See Greenfield*, 880 F.3d at 100.

Relator has alleged nothing of the kind. In his initial Complaint, Relator identified no patients and never alleged that any healthcare provider receiving alleged discounts submitted any claims to Medicare. *Compare*, ECF No. 1 ("Compl.") ¶¶ 80-81, 89-90, 97-98, 116–17, 127, *with* AC ¶¶ 120–22, 130–132, 139–41, 159–61, 171. Nor did he even allege that any such provider was enrolled in the Medicare program. To try to close this gap, Relator's Amended Complaint relies on a single boilerplate allegation: "As a result of the discounted service contracts Alcon provided, the aforementioned providers continued purchasing their IOLs and surgical supplies from Alcon. These IOLs and surgical supplies were used in cataract surgeries for, upon information and belief, Medicare beneficiaries." AC ¶¶ 121, 131, 140; *see also id.* ¶ 160. This speculative copy-and-paste allegation does not cure the factual deficiency in Relator's original Complaint.

To start, Relator still does not allege that a single provider who allegedly received a discount was enrolled in the Medicare program. Nor does he allege that any provider ever received a single cent of Medicare money. And he does not identify a single patient whose surgery involved an Alcon IOL. Relator cannot satisfy Rule 9(b) by speculatively pleading on "information and belief" that providers submitted claims to Medicare for procedures involving Alcon IOLs while offering no substantiating facts. *United States ex rel. Kelly v. Select Specialty Hosp.-Wilmington, Inc.*, 2018 WL 1568874, at *5 (D. Del. Mar. 30, 2018) (noting that information-and-belief pleading must "set[] forth specific facts upon which the belief is reasonably based"); *see also United States ex rel. Schmidt v. Zimmer, Inc.*, 2005 WL 1806502, at *3 n.6 (E.D. Pa. July 29, 2005) (same); *Zavala v. Wal-Mart Stores, Inc.*, 393 F. Supp. 2d 295, 313 (D.N.J. 2005) (same); *Fillmore*, 2024 WL 1051971, at *6 (a relator must "inject[] precision" into and "substantiat[e]" his "allegations of fraud"); *cf. United States ex rel. Wilkerson v. Allergan Ltd.*, 2024 WL 1242989, at *19 (N.D. Ill. Mar. 22, 2024) (a relator must allege facts to support that secondhand information is reliable).

Furthermore, Relator offers no factual support for his boilerplate speculation that providers must have submitted Medicare claims for procedures involving Alcon IOLs. As just discussed, Relator alleges no patient examples and nothing about any providers' IOL utilization patterns pre- and post-discount. *See Wilkerson*, 2024 WL 1242989, at *10, 21 (noting that "the failure to name a specific patient in connection with a kickback scheme will often mean that a relator's allegations are not particularized under Rule 9(b)" and finding relators needed but failed to provide "convincing data" showing physician-speakers' "prescription volume increased disproportionately to non-speakers' prescription volume" to sufficiently allege a nationwide fraud scheme). Nor does Relator attempt to compare such utilization patterns of providers who allegedly received discounts to providers who did not receive discounts. *See id.* at 21. In fact, most of Relator's examples do

not even suggest that surgeons at the practices were ever aware of the discounts. For example, Relator alleges that Brighton's "administrator" was the individual involved in service contract negotiations. AC ¶¶ 108, 114. He alleges that a group called "Physician Directed Partners" was involved in negotiations for customer Woodhams, and does not allege who was aware of or involved in negotiations for customers New Vision or Williams Eye. *Id.* ¶¶ 127–29, 136–138.

Relator's single boilerplate allegation offers even less than allegations deemed insufficient in other cases, like *United States ex rel. Fitzer v. Allergan, Inc.*, 2022 WL 846211, at *1–2 (D. Md. Mar. 22, 2022). The relator there alleged that defendants engaged in an unlawful kickback scheme by providing surgeons with free advertising services in exchange for recommending defendants' LAP-BAND device. *Id.* at *1–2. And unlike Relator here, the relator there "identif[ied] 18 surgeons by name, provider numbers, and states of practice and . . . list[ed] the precise number of LAP-BAND procedures for which they filed claims with Medicare during the applicable year and for which they were reimbursed." *Id.* at *6. But this was still not enough to plead false claims submissions stemming from the alleged scheme with particularity. *Id.* The court also followed multiple other courts in declining to take relator's mere "say-so" as sufficient to allege submission of false claims in fact stemmed from the purported scheme. *Id.* at *6–8; *see also AbbVie Inc.*, 2019 WL 4749967, at *11–12 (conclusory allegation that some doctors prescribed more of a drug because of kickbacks did not plead that false claims were submitted).

Relator not only relies solely on his mere insufficient "say-so" here, he pleads allegations that undermine it. As noted above, Relator alleges elsewhere in the Amended Complaint that "any manufacturer's IOLs can be used in cataract surgery." AC ¶ 90. And he alleges that at least one customer, Brighton, "voted" its "core business" to a competitor *after* "Alcon" allegedly offered it a service contract discount—suggesting that service contract discounts had no impact on the

practice's IOL purchases. *Id.* ¶ 114. These allegations demonstrate that providers may have used competitor products in their surgeries or, conversely, that customers were making decisions based on the welfare of their patients rather than because they were motivated by discounts contained in one-year service contracts. It is thus "far from a necessary hypothesis," that "Alcon's" alleged service contract discounts impacted provider behavior or their resulting claims submissions at all. *Perri*, 2019 WL 6880006, at *18; *see also AbbVie Inc.*, 2019 WL 4749967, at *11–12 (relator did not meet burden of alleging a link with particularity where plausible inference was that doctors may have used defendant's product based on independent medical necessity determinations).

Finally, even assuming *arguendo* Relator has met his burden to allege an AKS violation with respect to the seven customers in the Amended Complaint, Relator has utterly failed to plead a *nationwide* fraudulent scheme. To do so, Relator must plead examples in "sufficiently diverse geographic locations to support an inference of nationwide fraud." *Wilkerson*, 2024 WL 1242989, at *21; *see also Hericks v. Lincare Inc.*, 2014 WL 1225660, at *8 (E.D. Pa. Mar. 25, 2014) (relator did not allege a nationwide scheme with particularity where she did not allege supposed improper practices occurring in centers outside of Michigan resulted in improper claims to Medicare). Relator identifies seven customers who were allegedly offered discounts or fee waivers on a one-off basis, but he alleges the geographic location of only two of them: St. Luke's (Florida) and Kadrmas Eye Care (New England). *See* AC ¶¶ 107–31, 136–40, 157. He also alleges that discounts were "exception[s]" in practice, requiring a "legitimate" business rationale. *Id.* ¶¶ 119, 174. If anything, the Amended Complaint is consistent with the fact that a handful of alleged customers were "exception[s]" and not indicative of an alleged nationwide scheme.

### D. Relator Has Not Pled the Elements of an FCA Claim.

Relator's FCA/AKS claims fail for reasons beyond his inability to plead any underlying AKS violations or any fraud scheme with particularity. Those claims also fail because Relator has not plausibly alleged critical elements of any FCA claim—falsity, materiality, and loss.

#### 1. Relator fails to plead falsity because he has not alleged that providers submitted claims to Medicare for items resulting from AKS violations.

For the same reason that Relator has failed to particularly allege a requisite link between alleged kickbacks and claims submissions, he has also failed to sufficiently plead falsity under the FCA. Under the FCA, a claim submitted to a federal healthcare program must include items or services "resulting from" an AKS violation to be "false." 42 U.S.C. § 1320a-7b(g); *Greenfield*, 880 F.3d at 100. As just discussed, the Third Circuit requires a relator to sufficiently allege a causal "link" between the alleged kickback and claims presented to the Government to meet the AKS's "resulting from" requirement. *Greenfield*, 880 F.3d at 96, 100.

*Greenfield*'s requirement that relators plead a sufficient link between alleged kickbacks and claims submissions is a rigorous one. But the majority of circuit courts have held that in AKS-predicated FCA cases, relators must go even further and show that alleged kickbacks were the "but-for" cause of the challenged claims. *See United States v. Regeneron Pharms., Inc.*, 128 F.4th 324, 336 (1st Cir. 2025); *United States ex rel. Martin v. Hathaway*, 63 F.4th 1043, 1052–55 (6th Cir. 2023); *United States ex rel. Cairns v. D.S. Med. LLC*, 42 F.4th 828, 834–35 (8th Cir. 2022). While *Greenfield* controls, the but-for standard better aligns with the text of the AKS. Yet, Relator has not even attempted to meet either causal standard.

Under *Greenfield*, Relator has failed to plead "falsity" under the FCA for the same reason his claims fail to meet the particularity standard under Rule 9(b). He has alleged no facts supporting any "link" whatsoever between "Alcon's" service pricing and any Medicare claims.

Relator has not plausibly alleged any specific facts reliably supporting that a single provider that knowingly received a service discount subsequently submitted a claim to Medicare for a cataract surgery that included an Alcon IOL. *See supra*, pp. 26–29. In fact, he alleged that it was "often the case" that "Alcon's" IOL discounts were "insufficient to convince a customer to purchase Alcon's IOLs over a competitor's IOLs," and that at least one customer "voted" its "core business" to a competitor even after allegedly being offered a service contract discount. AC ¶¶ 87, 114.

### 2. Relator cannot allege materiality or loss because "Alcon's" service pricing did not impact Medicare reimbursements.

Relator's FCA/AKS claims also have a fundamental, insuperable materiality problem. Even if Relator could plausibly allege that Medicare reimbursed false claims, he could not establish that "Alcon's" service pricing caused an increase in Medicare reimbursement. As a result, he cannot claim that "Alcon's" pricing was material to the Government. *See United States ex rel. Mbabazi v. Walgreen Co.*, 2021 WL 4453600, at *6 (E.D. Pa. Sept. 28, 2021).

In cases involving fixed-rate Medicare reimbursement, "courts have held that there is no FCA liability where a falsely-claimed service or item does not affect the rate of reimbursement." *United States ex rel. Sirls v. Kindred Healthcare, Inc.*, 469 F. Supp. 3d 431, 445 (E.D. Pa. 2020). Thus, to sustain an FCA claim in cases where Medicare's reimbursement rate is fixed, a relator must establish a "causal chain" showing that the defendant's claims "directly affected the amount of reimbursement" and caused an "increase in payouts." *Id.* at 446.

This Court's decision in *Walgreen* is instructive. The Court dismissed FCA claims against Walgreens to the extent that they were premised on allegations that the pharmacy had submitted false claims to managed care organizations ("MCOs") that contracted with Medicaid. *Walgreen*, 2021 WL 4453600, at *6. Medicaid reimbursed the MCOs on a fixed, capitated basis, regardless of the particular services their members received. *Id.* at *1. Accordingly, relator needed to allege

facts showing that Walgreens's allegedly false certifications had somehow increased the fixed rate that Medicaid paid the MCOs per member. This Court held that Relator could not make that "connection" and therefore could not show that Walgreens's certifications to the MCOs had been "material" to the Government. *Id.* at *6.

Precisely the same problem undercuts Relator's AKS-based FCA claims here. The customers Relator identifies in the Complaint are ASCs. *See, e.g.*, AC ¶¶ 107, 137, 157–58. But Medicare reimburses ASCs a predetermined fixed fee for cataract surgeries regardless of the type, brand, or price of conventional IOL. *See supra*, pp. 6–7; AC ¶ 46. Accordingly, Relator needed to establish that "Alcon's" service pricing somehow caused an increase in Medicare payouts for cataract surgeries. *Kindred Healthcare*, 469 F. Supp. 3d at 446; *Walgreen*, 2021 WL 4453600, at *6. The Amended Complaint does not allege such an increase, and indeed, Relator cannot do so because the Government does not reimburse providers for the cost of service contracts, and the IOL used has *no* impact on the cost of Medicare reimbursement for cataract surgeries in ASCs. *See supra*, pp. 6–7; AC ¶ 46 (alleging that the "global surgery package" reimbursed includes the cost of a "conventional IOL"; it does not vary based on brand of IOL used).

The reimbursement scheme not only presents a materiality problem but also means that Relator cannot show any loss to the Government, which is independently fatal. Relator does not allege that the alleged service contract discounts caused surgeons to perform an increased amount of cataract surgeries. The Government would have paid the same bundled amount for such surgeries regardless of whether an "Alcon" or competitor IOL was used. And, as noted above, Relator has not even alleged that Medicare actually reimbursed a single claim at issue. Without a showing of loss, Relator's FCA claims cannot survive. *See United States ex rel. Sanders v. Am.-Amicable Life Ins. Co. of Tex.*, 545 F.3d 256, 259 (3d Cir. 2008) ("A party makes 'false or

fraudulent claim[s] for payment or approval' to the government within the meaning of the statute only where such claims 'cause or would cause economic loss to the government.'") (citation omitted); *Hutchins v. Wilentz, Goldman & Spitzer*, 253 F.3d 176, 184 (3d Cir. 2001) ("[T]he submission of false claims to the United States government for approval which do not or would not cause financial loss to the government are not within the purview of the False Claims Act."); *Flanagan v. Bahal*, 2015 WL 9450826, at *4 (D.N.J. Dec. 22, 2015) (dismissing claim for lack of loss where alleged conduct would have had no impact on what the Government paid for the procedure).

Relator's failure to plead materiality and loss are two additional, independent reasons why his FCA claims (Counts I–IV) fail to the extent that they are predicated on his AKS Theory.

## II. RELATOR HAS NOT PLAUSIBLY ALLEGED ANY SCHEME TO DEFRAUD THE DEPARTMENT OF VETERANS AFFAIRS (COUNTS I–IV).

Relator's other FCA theory is that the VA paid more for Alcon service contracts than private businesses. In short, Relator claims that the VA agreed to pay a higher annual fee for service than Alcon typically charged its private sector customers. AC ¶¶ 178–203. There are many problems with this theory. First, he has provided no basis to suggest that, even if it were true that one or more Defendants charged the VA high prices, this provides the basis for an FCA violation. Second, even assuming Relator could point to some applicable legal requirement, Relator does not plead facts supporting the alleged scheme with requisite particularity.

Relator claims that Defendants' service contracts with the VA constituted "fraud," but he has not identified a single legal requirement that Defendants' pricing violated nor any misrepresentation an Alcon Defendant made to the VA. To claim that Defendants violated the FCA by "overcharging" the VA, Relator needed to show, at a minimum, that Defendants knowingly violated or misrepresented compliance with a relevant contractual or legal provision

that governed service pricing (and this violation or misrepresentation was material to the Government's payment decision). *See United States ex rel. Hutchins v. DynCorp Int'l, Inc.*, 342 F. Supp. 3d 32, 47–48 (D.D.C. 2018); *see also United States ex rel. Thomas v. Lockheed Martin Aeroparts, Inc.*, 2016 WL 47882, at *7 (W.D. Pa. Jan. 4, 2016) (dismissal warranted where complaint "failed to identify any contracts, regulations, or statutes that apply to [the] allegations"); *United States ex rel. Zwirn v. ADT Sec. Servs., Inc.*, 2014 WL 2932846, at *8 (D.N.J. June 30, 2014) ("Whether a given claim would be fraudulent would depend on the specifics of the individual contract and the invoices submitted under the contract[.]"). Relator does no such thing. And merely asserting, without authority, that the VA should have paid less for service does not establish an FCA violation. *See DynCorp*, 342 F. Supp. 3d at 55 (holding that allegations did not indicate the Government was "charge[d] . . . for goods and services that it did not receive," and while the Government "could have paid less," relator alleged at most a "breach of contract" claim but "not a false claim" under the FCA).

Nor has Relator sufficiently pled the details of this alleged "scheme." Despite asserting that he had "access to information on every Government contract purchased from Alcon," (AC ¶ 198) Relator's allegations lack any detail whatsoever. Relator asserts that the VA purchased "many" service contracts, (AC ¶¶ 178, 197) but he does not identify them. Instead, Relator merely asserts that, sometime before 2018, the VA signed service contracts for unspecified equipment at unspecified prices above what "Alcon" charged unspecified private sector customers. AC ¶ 179. Without particularized details about the contracts and pricing supposedly at issue, and the legal requirements defendants supposedly violated, Relator's claims cannot satisfy the strictures of Rule 9(b). *See United States ex rel. Hunter v. Fillmore Cap. Partners, LLC*, 2024 WL 1051971, at *6 (E.D. Pa. Mar. 11, 2024) (Rule 9(b) requires more than "an overview of the scheme, with no

accompanying factual explanation"); *United States ex rel. Cavallino Consulting, LLC v. Smith & Nephew, Inc.*, 2018 WL 3966301, at *2 (D. Mass. Aug. 17, 2018) (dismissing complaint that failed to "identify any specific orders that a government hospital placed with [d]efendant" or "any specific claims submitted to the government hospitals for payment under any contract").

Relator musters only one purported example for his VA Theory, but it hurts, not helps, him. Without identifying the actual contracts or their terms, Relator alleges that, in 2022, the VA "purchased at least nine Alcon service contracts for Alcon's Wavelight EX500," paying "between $31,362.50 and $32,500.08, annually." AC ¶ 200. But those prices match or fall below the $32,500 that Relator says Alcon typically charged. *Id.* ¶¶ 185–86. Far from "overcharging" the VA, then, Relator's one example shows that Alcon charged the VA the same or even less than what Alcon charged private sector businesses. These "internal inconsistencies render [Relator's] allegations deficient and prevent the court from making" any inferences in Relator's favor. *Davis*, 2012 WL 3206030, at *6 & n.63.

Relator's VA theory fails, and the Court should dismiss Counts I–IV in their entirety.

## III. RELATOR FAILS TO PLEAD A CONSPIRACY CLAIM (COUNT III).

Count III purports to assert a conspiracy claim under the FCA, 31 U.S.C. § 3729(a)(1)(C), incorporating Relator's other allegations and alleging that "Defendants" conspired "together and with known and unknown individuals" to violate the FCA. AC ¶¶ 227–232. This claim fails for several independent reasons.

*First*, the intracorporate conspiracy doctrine dictates that a parent company and its subsidiaries are legally "incapable of conspiring" with each other. *See United States ex rel. Greenfield v. Medco Health Sys. Inc.*, 2014 WL 4798637, at *11–12 (D.N.J. Sept. 26, 2014) (collecting cases that apply the doctrine to the FCA and dismissing FCA conspiracy claim).

*Second*, Relator fails to plead the elements of a conspiracy claim. He never alleges, for example, that Defendants agreed amongst themselves to engage in a fraudulent scheme—even though that agreement is "the essence" of a conspiracy claim. *Id.* at *11. Nor does Relator plead the scienter that conspiracy would require. Unlike an ordinary FCA claim, *see* 31 U.S.C. § 3729(b), a conspiracy claim requires proof that Defendants specifically intended to defraud the Government. *See, e.g.*, *United States v. Marlin Med. Sols. LLC*, 579 F. Supp. 3d 876, 891 (W.D. Tex. 2022) (explaining that "conspiracy under the FCA" "require[s] specific intent to defraud or to violate the law"); *United States ex rel. Holbrook v. Brink's Co.*, 2015 WL 196424, at *24 (S.D. Ohio Jan. 15, 2015) ("Plaintiff must . . . show that all alleged parties to an agreement that resulted in a violation of the FCA actually intended to defraud the government."). Yet Relator makes no effort to allege that Defendants acted in concert with specific intent to defraud.

*Third*, for all the reasons discussed, Relator has not pled any underlying FCA violation. "[T]here can be no liability for conspiracy where there is no underlying violation of the FCA." *See United States ex rel. Petras v. Simparel, Inc.*, 857 F.3d 497, 507 n.53 (3d Cir. 2017).

## IV. RELATOR MAY NOT ASSERT A REVERSE FCA CLAIM (COUNT IV).

Count IV attempts to assert a reverse FCA claim under 31 U.S.C. § 3729(a)(1)(G). AC ¶¶ 233–239. Count IV fails because it impermissibly duplicates Relator's other claims.

The FCA creates several causes of action, including a cause of action against any person who unlawfully avoids or decreases an "obligation to pay" money to the Government—known as a "reverse false claim." 31 U.S.C. § 3729(a)(1)(G). Proving a reverse false claim requires establishing that the defendant unlawfully evaded an "established duty" to pay money to the Government. *Id.* § 3729(b)(3); *see United States ex rel. Petratos v. Genentech, Inc.*, 141 F. Supp. 3d 311, 322 (D.N.J. 2015) (explaining the reverse FCA provision "only appl[ies] where there is an obligation to pay the Government"); *United States ex rel. Thomas v. Siemens*, 708 F. Supp. 2d 505,

514 (E.D. Pa. 2010) (noting there must be "a 'clear' obligation or liability to the government") (citation omitted). Here, Relator has not actually alleged that any Alcon Defendant evaded an obligation to pay money to the Government. In fact, Relator admits that the Government has never made any demand for payment. *See* AC ¶ 236. Instead, Relator's reverse FCA count merely claims that Alcon Vision and Alcon Laboratories earned revenue from IOL sales tainted by AKS violations and that they should be required to hand over some of those proceeds to the Government. But a reverse FCA claim, like Relator's, that merely alleges that "defendants wrongfully retained fraudulently obtained funds [is] not cognizable, because such claim[] 'merely duplicates' affirmative FCA claims." *Walgreen*, 2021 WL 4453600, at *7 (quotation omitted); *see also, e.g.*, *Sturgeon v. Pharmerica Corp.*, 438 F. Supp. 3d 246, 280–81 (E.D. Pa. 2020) (noting that "[e]very case the Court is aware of" has concluded that "relators may not use § 3729(a)(1)(G) as a 'redundant basis' for liability") (citation omitted).

## V. RELATOR'S RETALIATION CLAIM SHOULD BE DISMISSED (COUNT V).

Count V asserts a claim against "All Defendants" for retaliation under the FCA, 31 U.S.C. § 3730(h). AC ¶¶ 240–45. Relator alleges that Alcon Vision placed him on a PIP and fired him because he raised concerns about the company's service pricing. *Id.* ¶¶ 204–09.

Relator's retaliation claim fails because he has contradicted his own allegations in the Texas action, failed to plead essential elements, and executed a release in the Texas litigation that bars this claim.

### A. Count V Fails as to Alcon Laboratories Because It Did Not Play Any Part in Relator's PIP or Termination.

As a threshold matter, Count V should be dismissed as to Alcon Laboratories because Relator does not allege that Alcon Laboratories played any part in his PIP or termination. Though Relator nominally asserts Count V against "All Defendants," the Amended Complaint now alleges

only that "*Alcon Vision* retaliated against Relator." AC ¶ 204 (emphasis added). Relator alleges that Alcon Laboratories hired him in 2018 but that he transitioned to Alcon Vision in 2019, years before the PIP (November 2022) and termination (February 2023). *See id.* ¶¶ 2, 11, 68–69, 208–09. Unsurprisingly, then, Relator's retaliation allegations concern Alcon Vision exclusively and do not mention Alcon Laboratories. *See id.* ¶¶ 204–09. Relator cannot sustain a retaliation claim against a company that is not alleged to have played any role in the employment actions that he now claims constituted retaliation. *See Trezza v. Soans Christian Acad., Inc.*, 2019 WL 1359740, at *4–5 (E.D. Pa. Mar. 25, 2019) (dismissing FCA retaliation claims against defendants because they were not plaintiff's employer); *United States ex rel. Lord v. NAPA Mgmt. Servs. Corp.*, 2017 WL 2653164, at *12 (M.D. Pa. June 20, 2017) (similar).

### B. Relator Fails to Plead the Elements of an FCA Retaliation Claim.

Relator's retaliation claim against Alcon Vision likewise fails on the merits. To prove an FCA retaliation claim, a plaintiff must show both that (1) "he engaged in protected conduct" within the meaning of the FCA and (2) he "was discriminated against because of his protected conduct." *United States ex rel. Ascolese v. Shoemaker Constr. Co.*, 55 F.4th 188, 191, 194 (3d Cir. 2022) (internal quotation marks omitted). Relator has not pled either element.

#### 1. Relator has not alleged that he engaged in "protected conduct."

Relator contends that, by allegedly voicing concerns to his supervisors, he engaged in "protected activity" under the FCA. *See* AC ¶¶ 205–06, 241–44. He did not.

Protected activity has a specific meaning in the context of the FCA. Relator must show that he (1) took steps "in furtherance of an [FCA] action" (the "FCA litigation prong") or (2) made "other efforts to stop" FCA violations (the "other efforts prong"). *Hall v. Abington Mem'l Hosp.*, 2023 WL 6216526, at *3 (E.D. Pa. Sept. 25, 2023) (quoting 31 U.S.C. § 3730(h)(1) and citing *Ascolese*, 55 F.4th at 191, 194). Relator invokes both prongs but pleads neither. AC ¶¶ 243–44.

Relator vaguely alleges that at some point he told unidentified "Alcon staff" and his "supervisors" that "Alcon's" alleged discounts and overpriced VA contracts were not "considered fair business practice," were unethical, and were "improper and illegal." AC ¶¶ 152, 188, 205. Even if true, merely expressing these generic concerns is not "protected activity" under the FCA.

<u>FCA Litigation Prong:</u> To have engaged in protected activity under the FCA litigation prong, Relator needed to put Alcon Vision on notice that it was violating the FCA specifically—and that FCA litigation was a "distinct possibility." *See Hutchins v. Wilentz, Goldman & Spitzer*, 253 F.3d 176, 188 (3d Cir. 2001) (citation omitted). An employee puts their employer "on notice of the 'distinct possibility' of litigation when" he "takes actions revealing the intent to report or assist the government in" an FCA investigation. *Id.* at 189. Here, Relator never alleges that he put Alcon Vision on notice that he was "contemplating filing a qui-tam action against it." *Id.* at 188 (citation omitted).

<u>Other Efforts Prong.</u> The other efforts prong would have required Relator to show that he took steps "to prevent or halt … perceived violations of the FCA." *Lisenbery v. Olympus Corp. of the Ams.*, 2025 WL 609193, at *5 (E.D. Pa. Feb. 25, 2025). "[T]he FCA is not merely an 'all-purpose antifraud statute or a vehicle for punishing garden-variety breaches of contract or regulatory violations.'" *Id.* at *7 (quoting *Universal Health Servs.*, 579 U.S. at 194). Thus, to engage in "protected activity" under the "other efforts" prong, an employee must do more than report generic "compliance" or "ethics" concerns. *See, e.g.*, *Hall*, 2023 WL 6216526, at *3 (reporting concerns that a company is violating "general principles of ethics and fair dealing" or that an employee "suspect[s] fraud" is insufficient under the "other efforts" prong (quoting *Hickman v. Spirit of Athens, Alabama, Inc.*, 985 F.3d 1284, 1289 (11th Cir. 2021)). The employee must take steps to prevent his company from engaging in conduct because the employee

reasonably believes that the conduct violates the FCA. *See Lisenbery*, 2025 WL 609193, at *6–7 (dismissing retaliation claim under "other efforts" prong because relator failed to establish that he reported alleged conduct that "put Defendants at risk under the FCA"); *United States v. Univ. of Pittsburgh of Commonwealth Sys. of Higher Educ.*, 2022 WL 14851121, at *3–4 (W.D. Pa. Oct. 26, 2022) (reporting concerns that company "fail[ed] to comply with CMS regulations" was not "engag[ing] in protected conduct" under FCA). But according to Relator, all he did was share generic "compliance concerns" and tell colleagues that "Alcon's" conduct was "unethical" and not "fair." AC ¶¶ 152, 188, 205. Relator never alleges that he told anyone at Alcon Vision that its service pricing violates the FCA, let alone that he took steps to stop those perceived violations.

**2. Relator has not alleged that Alcon Vision placed him on a PIP and ended his employment because he engaged in protected conduct.**

To sustain a retaliation claim, Relator also would have needed to plausibly allege that Alcon Vision placed him on a PIP and fired him "because of" his protected conduct. *See DiFiore v. CSL Behring, LLC*, 879 F.3d 71, 76 (3d Cir. 2018). This element requires Relator to plead facts showing that his protected activity was *the reason* for his PIP and termination (i.e., the "but for" cause)—not just "one of several motivating factors." *Hall*, 2023 WL 6216526, at *5.

Yet, the Amended Complaint does not identify who placed Relator on a PIP or fired him. And Relator also does not allege that whoever made those decisions actually knew that Relator had voiced concerns about Alcon Vision's service pricing, let alone that the person(s) specifically intended to retaliate against Relator for doing so. These basic pleading deficiencies are enough, in and of themselves, to sink Relator's retaliation claim. *See Hutchins*, 253 F.3d at 188 ("To meet this requirement, a plaintiff must show his employer had knowledge that he was engaged in 'protected conduct' and that the employer retaliated against him because of that conduct.").

Relator's retaliation claim also fails because he has since expressly contradicted his claim that Alcon Vision fired him for engaging in protected conduct. While this case was under seal, Relator filed a new retaliation claim in Texas state court changing his retaliation theory. In Texas, Relator claimed that his supervisors fired him because he had refused to discipline a colleague after she filed a complaint against his boss. Albala Decl. Ex. 1 ¶¶ 14–33.

Relator cannot claim that Alcon Vision fired him "because" he voiced concerns about the company's service pricing when he has since told another court that he was fired for different reasons entirely. The Court can take judicial notice of Relator's Texas Complaint. *See Thompson v. Slatzer*, 2021 WL 3639682, at *3 n.2 (W.D. Pa. July 30, 2021) (court can take judicial notice of documents filed in other court proceedings "because they are matters of public record"), *report and recommendation adopted*, 2021 WL 3635110 (W.D. Pa. Aug. 17, 2021). And the Court need not accept Relator's irreconcilable allegations concerning Alcon Vision's supposed motive for his PIP and termination. *See In re Wash. Mut. Inc.*, 741 F. App'x 88, 91 n.3 (3d Cir. 2018) ("We need not . . . credit factual allegations contradicted by matters of which we may take judicial notice."); *Banks v. Cnty. of Allegheny*, 568 F. Supp. 2d 579, 588 (W.D. Pa. 2008) (A court does not "have to accept as true anything in the complaint which contradicts facts of which the court may take judicial notice[.]").

### C. Relator's Retaliation Claim Is Also Barred by a Prior Release.

Count V should also be dismissed because Relator released all claims against Alcon Vision when he settled the Texas Litigation. Following mediation in that case, Relator and Alcon Vision executed a written Mediated Settlement Agreement. Albala Decl. Ex. 3. The parties specified that their Agreement "may be enforced as any other contract." *Id.* ¶ 7. And the Agreement was, in fact, binding and enforceable as a matter of Texas law because it was "made pursuant to" and in compliance with "Rule 11, Texas Rules of Civil Procedure." *Id.* ¶ 7; *see also Padilla v. LaFrance*,

907 S.W.2d 454, 460–61 (Tex. 1995) (finding series of letters constituted binding settlement agreement under Rule 11); *CherCo Props., Inc. v. L. Snakard & Gambill, P.C.*, 985 S.W.2d 262, 265–66 (Tex. App. 1999) (finding settlement agreement enforceable). As part of the settlement, Relator "agree[d] to execute a full and complete release in favor of Alcon and all of those in privity with Alcon relating to the subject matter of the Lawsuit and all disputes between them, whether the subject of the Lawsuit or not." Albala Decl. Ex. 3 ¶ 2. That general release, which Relator granted to settle a suit claiming that his termination was retaliatory, plainly encompasses the FCA retaliation claim that Relator had already asserted in this case. As a result, the Mediated Settlement Agreement bars Relator from maintaining his FCA retaliation claim. *See, e.g.*, *McGowan Inv'rs LP v. Keefe Bruyette & Woods, Inc.*, 540 F. Supp. 2d 571, 572, 578 (E.D. Pa. 2008) (court will grant Rule 12(b)(6) motion where the claim is "barred by a court-approved release in [a] settlement"); *Morris v. W. Manheim Twp.*, 2013 WL 995551, at *5–7 (M.D. Pa. Mar. 13, 2013) (dismissing suit because earlier settlement was a contractual bar to plaintiff's claims); *Love v. Med. Coll. of Wisconsin*, 371 F. Supp. 3d 489, 492–93 (E.D. Wis. 2016) (holding plaintiff's FCA retaliation claim was barred by a general release plaintiff executed); *United States ex rel. Davis v. Lockheed Martin Corp.*, 2010 WL 4607411, at *4–5 (N.D. Tex. Nov. 15, 2010) (FCA retaliation claim was barred by release); *United States ex rel. Keeler v. Eisai, Inc.*, 2011 WL 13099033, at *3, 7 (S.D. Fla. June 21, 2011) (release plaintiff signed after initiating a state law action subsequent to filing *qui tam* action barred FCA retaliation claim).

## VI. RELATOR LACKS AUTHORITY TO PROSECUTE COUNTS I-IV.

The FCA's *qui tam* provisions twice run afoul of Article II of the Constitution in authorizing a relator to maintain an action even where the Government has declined to intervene. First, because relators exercise significant authority and occupy continuing positions, the FCA's *qui tam* provisions cannot be squared with the Appointments Clause. Second, these provisions

violate the Vesting and Take Care Clauses because they impermissibly vest executive power in private individuals without providing for meaningful supervision or removal authority. Either basis is sufficient to deem the statute unconstitutional as applied to declined *qui tams*.[7]

Because Relator lacks constitutional authority to prosecute FCA claims that belong to the United States alone, Relator's substantive FCA claims (Counts I–IV) should be dismissed.

### A. The FCA's *Qui Tam* Provisions Violate the Appointments Clause.

FCA relators are "officers" under the Appointments Clause because they "exercise significant authority pursuant to the laws of the United States" and "occupy a continuing position established by law." *Lucia v. SEC*, 585 U.S. 237, 245 (2018) (cleaned up). The constitution therefore requires that they be appointed in accordance with the Appointments Clause. The statute, however, imposes no such requirement. Because relators are permitted to operate as "officers" without having been appointed, the FCA's qui tam provisions cannot be squared with Article II.

To start, relators wield significant authority. The FCA authorizes relators to initiate and prosecute enforcement actions "in the name of the Government," 31 U.S.C. § 3730(b)(1)—even where, as here, the Government has declined to intervene. These lawsuits seek to redress injuries to the United States, *id.* §§ 3729(a)(1), 3730(b)(1), backed by the penalty of "damages that are essentially punitive in nature," *Vt. Agency of Nat'l Res. v. United States ex rel. Stevens*, 529 U.S. 765, 784 (2000). The FCA thus authorizes private parties—with no showing of individual injury—to choose whether and when to file suit on behalf of the United States. In cases where the Government declines to intervene, the private individual has, in effect, flouted the Government's own decision not pursue an action. *See In re Aiken County*, 725 F.3d 255, 264 (D.C. Cir. 2013)

[7] The Third Circuit is currently evaluating a challenge to the constitutionality of the FCA's *qui tam* provisions under Article II. *See United States ex rel. Penelow v. Janssen Prods., LP*, No. 25-1818 (3d Cir.).

(opinion of Kavanaugh, J.) ("One of the greatest *unilateral* powers a President possesses . . . is the power to protect individual liberty by essentially under-enforcing federal statutes regulating private behavior."). In short, by conducting "litigation in the courts of the United States for vindicating public rights," a "relator obviously 'exercis[es] significant authority pursuant to the laws of the United States." *United States ex rel. Montcrief v. Peripheral Vascular Assocs., P.A.*, 133 F.4th 395, 410–11 (5th Cir. 2025) (Duncan, J., concurring and "point[ing] out the constitutional flaws in the FCA's *qui tam* device" (quoting *Buckley v. Valeo*, 424 U.S. 1, 140 (1976))).

Relators also occupy a "continuing position established by law." *Lucia*, 585 U.S. at 245. A position qualifies as "continuing" if "(1) the position is not personal to a particular individual; (2) the position is not transient or fleeting; and (3) the duties of the position" relate to a "core power of government." *United States v. Donziger*, 38 F.4th 290, 297–98 (2d Cir. 2022). Relators satisfy all three requirements. First, "anyone can sue under the FCA," checking the initial box. *Montcrief*, 133 F.4th at 411 (Duncan, J., concurring).

Second, the FCA defines the scope of relators' authority and obligation in a "continuing and permanent" fashion, *Lucia*, 585 U.S. at 245, and relators prosecute actions that may last for years with ongoing preclusive effects. In *Morrison v. Olson*, 487 U.S. 654 (1988), for example the Supreme Court applied these principles to hold that an independent counsel qualifies an "officer" of the United States, even though authorized to act in only a single matter. *Id.* at 660–68, 671 n.12, 672. While any individual independent counsel might handle a discrete matter, the position was nevertheless continuing because Congress created an ongoing *role* of independent counsel. *See id.* While the Eleventh Circuit came to a different conclusion in *United States ex rel. Zafirov v. Florida Medical Associates*, 2026 WL 2581886 (11th Cir. Sept. 1, 2026), the court did

not grapple with the full scope of relators' authority. The Eleventh Circuit recognized that "*Morrison* demonstrates that a position's temporary nature is not sufficient on its own to show that a role is not continuing." *Id.* at *6. Even so, the court concluded that "the lack of a continuing emolument or continuing duties … clearly distinguish relators from officers such as independent counsel." *Id.* But even assuming any individual relator's "tenure" is "intermittent" and "nonpermanent," *id.* at *4, the FCA creates an enduring office that exists independent of whichever relator pursues a particular action—much like the independent counsel role in *Morrison*.

Finally, relators' duties are hardly "incidental" in pursuing enforcement actions on behalf of the United States. To the contrary, a relator exercises "a core power of government" in choosing whether and when to file suit on the Government's behalf. *See, e.g.*, *Donziger*, 38 F.4th at 298; *Aiken*, 725 F.3d at 264.

In sum, despite functioning as "officers of the United States," relators are never appointed as such. The FCA's *qui tam* device is therefore unconstitutional.

### B. The FCA's *Qui Tam* Provisions Violate the Vesting and Take Care Clauses.

The FCA's *qui tam* provisions separately fail under the Vesting and Take Care Clauses. Article II vests all executive power in the President and further provides that the President "shall take Care that the Laws be faithfully executed." U.S. Const. art. II, §§ 1, 3. A critical component of the President's authority is "the choice of how to prioritize and how aggressively to pursue legal actions against defendants who violate the law." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 429 (2021). Reflecting as much, the "[s]ettled rule" has long been that "[c]ivil suits, in the name and for the benefit of the United States," must be brought by government attorneys "subject to the

direction, and within the control of, the Attorney-General," who in turn is responsible to the President. *The Confiscation Cases*, 74 U.S. (7 Wall.) 454, 457–59 (1868).

Under the FCA, however, this core executive power is delegated to private individuals. In other words, "the FCA 'allows Congress to circumvent the Executive's check and to have its laws enforced directly by its own private bounty hunters.'" *Montcrief*, 133 F.4th at 412 (Duncan, J., concurring) (internal quotation marks and citation omitted). This arrogation of authority is particularly problematic where, as here, the Government declines to intervene. In that scenario, the FCA permits a private citizen to prosecute a suit for the United States—notwithstanding the United States' lack of interest in it—and seek a final judgment that will be binding on it in perpetuity. *See id.*

Compounding this problem, relators are not subject to any meaningful Executive supervision or removal authority. On the contrary, the Government's authority is limited to seeking to dismiss an action in its entirety—after first intervening and establishing that dismissal is warranted. *See* 31 U.S.C. § 3730(c)(2)(A). In other words, the FCA does not provide a path for the Government to ensure that an action is conducted under presidential direction and oversight. Nor, for that matter, does the Government have "unfettered discretion to dismiss" the matter. *See United States ex rel. Polansky v. Executive Health Resources, Inc.*, 599 U.S. 419, 435 (2023). The statute thus impedes the Executive's authority to "accomplish[] its constitutionally assigned functions." *Morrison*, 487 U.S. at 695. In short, the Constitution "does not allow this outsourcing of prosecutorial power to a private person." *Montcrief*, 133 F.4th at 412 (Duncan, J., concurring).

## VII. THE COMPLAINT SHOULD BE DISMISSED WITH PREJUDICE.

The Court should dismiss the Amended Complaint with prejudice. Relator has amended his Complaint once already and he is not entitled to do it again. A court may deny a plaintiff leave to amend if the amendment "would be inequitable or futile." *Phillips v. County of Allegheny*, 515

F.3d 224, 245 (3d Cir. 2008). And an amendment would be futile if it "cannot cure the deficiencies" in the complaint. *Bulls v. FBI*, 2018 WL 5013787, at *3 (W.D. Pa. Oct. 15, 2018).

Relator's amendments did not cure the deficiencies in his Complaint, and there is no reason to believe another amendment would do the trick. First, if Relator had new allegations that could have saved his claims, then he should have included them in his Amended Complaint. But the little Relator added did not fix the fundamental defects in his claims. And there is no reason to believe that Relator could now conjure up new "facts" to fix those problems. *See Shanks v. Hall*, 2019 WL 2583013, at *10 (E.D. Pa. June 21, 2019) (denying leave to amend because plaintiff had not "proposed alleging[] any additional facts that would persuade the Court there was any fraud"). Relator has pled his retaliation claim three times now and irreconcilably contradicted himself. And Relator's FCA claims are supposedly based on knowledge that he gathered while working for Alcon Vision. But Relator's employment ended years ago, before this litigation even began.

Second, there are no amount of facts that Relator ever *could* add to his Complaint to save it. For example, as discussed above, the Medicare reimbursement scheme for cataract surgeries involves a predetermined fixed rate that does not vary with the type of IOL used. Relator thus has no hope of ever showing requisite loss to the Government or materiality under the FCA. Relator also cannot point to any legal requirement defendants violated that would support his nonsensical theory that defendants' failure to extend alleged "kickbacks" to the VA somehow constitutes a cognizable FCA theory. And Relator's FCA Retaliation claim is barred by his prior release. *See, e.g.*, *United States ex rel. Bennett v. Bayer Corp.*, 2024 WL 1507689, at *9 (D.N.J. Apr. 4, 2024) (dismissing FCA complaint with prejudice because amendment "would be futile"); *United States ex rel. Collado v. Bracco USA, Inc.*, 2024 WL 1161384, at *7 (D.N.J. Mar. 14, 2024) (similar).

Any further amendment would thus be futile, both because it could not save Relator's claims and it could not grant him the constitutional authority that he needs to prosecute this case.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that this Court dismiss the Amended Complaint in its entirety with prejudice.

Dated: October 14, 2026

Respectfully submitted,

*/s/ Amy B. Carver*
Catherine M. Recker (PA ID No. 56813)
Amy B. Carver (PA ID No. 84819)
**WELSH & RECKER, P.C.**
306 Walnut Street
Philadelphia, PA 19106
Tel: (215) 972-6430
Fax: (985) 617-1021
cmrecker@welshrecker.com
abcarver@welshrecker.com

Ilene Albala (admitted *pro hac vice*)
J. Kirk Ogrosky (admitted *pro hac vice*)
Jordan L. Moran (admitted *pro hac vice*)
Jenna Welsh (admitted *pro hac vice*)
**GOODWIN PROCTER LLP**
1900 N Street, NW
Washington, DC 20036
Tel: +1 202 346 4000

*Counsel for Defendants Alcon Inc.; Alcon Laboratories, Inc.; and Alcon Vision, LLC.*

## <u>CERTIFICATE OF SERVICE</u>

I, Amy B. Carver, hereby certify that I caused a true and correct copy of the foregoing Defendants Alcon Vision, LLC and Alcon Laboratories, Inc.'s Motion to Dismiss to be filed with the Clerk of Court of the United States District Court for the Eastern District of Pennsylvania using the ECF system, and the filing is available for viewing and download from the ECF system, and a true and correct copy was served via ECF on all counsel of record registered with the ECF system.

Dated: October 14, 2026

*<u>/s/ Amy B. Carver</u>*
Amy B. Carver